LONG ET UX. *v.* DIXON ET AL.

[No. 58, October Term, 1952.]

*Decided January 9, 1953.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Wesley E. Thawley* and *Marvin H. Smith,* with whom were *Thawley and Smith* on the brief, for appellants.

*Layman J. Redden,* with whom was *W. Brewster Deen* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court for Caroline County dismissing a bill of complaint brought by a creditor of the grantors of two deeds in an effort to set them aside on the ground they were fraudulent as to the complainants as subsisting creditors of the grantors. The deeds conveyed two farms in

Caroline County, a 72 acre farm to one son of the grantors and a 132 acre farm to the other. The grantees asserted their right to retain the farms conveyed to them respectively on the basis that they were likewise subsisting creditors at the time of the conveyances, and that the deeds were executed for a fair consideration in satisfaction of a *bona fide* past due indebtedness, and were accepted by them in good faith.

In *Drury v. State Capital Bank*, 163 Md. 84, 161 A. 176, Judge Parke, delivering the opinion of the court, went fully into the law of fraudulent conveyances. He pointed out that the Maryland statutes, declaring the common law, render void all conveyances made with intent to delay, hinder or defraud creditors. The statutes are concerned with legal and not moral intent; if the direct and inevitable consequence of an act is to delay, hinder or defraud creditors, there arises a conclusive presumption that the legal object furnished one of the motives for the doing of the act, and whatever the real intent, a fraud exists in law. Preferences are not necessarily fraudulent and, aside from a statute of insolvency or bankruptcy, an innocent creditor who can secure enough to satisfy his claim is entitled to hold it against other creditors, although the debtor is insolvent. This rule is subject to the qualification that the property transferred must be fairly equivalent to the debt satisfied. Thus, a debtor for a fairly equivalent consideration, whether presently arising or being in satisfaction of an antecedent debt, may transfer in good faith all or a part of his property to one of his creditors. Even if the grantor has a fraudulent intent this will not vitiate or impair a conveyance unless the grantee participates in the fraudulent intent. *McCauley v. Shockey*, 105 Md. 641, 645, 66 A. 625; *Kennard v. Banking & Trust Co.*, 176 Md. 499, 6 A. 2d 258. A recent review of the authorities was had in *Kline v. Inland Rubber Corp.*, 194 Md. 122, 137, 69 A. 2d 774, 780. Judge Markell there said, for the court:

> "Aside from bankruptcy or insolvency statutes, preferences are not unlawful. They are not per se fraudulent, even when given to a wife or other near relative."

He pointed out further in this opinion, although he who alleges fraud generally must prove it, "facts and circumstances of a conveyance, especially one between near relatives, may be such as to shift to one who claims to be a *bona fide* purchaser for value the burden of proving that he is." He continued:

> "If a conveyance is made and accepted with intent to hinder, delay or defraud creditors, it matters not that a full consideration has been paid."

The parties agree, as did the lower court and as do we, that the burden of proof is on the grantees of the farms to show that they are entitled to retain them under the rules stated. The decision in the case must turn on whether or not they have met that burden.

Armine C. Dixon and his wife purchased one of the farms in question in Caroline County in 1943 and the other in 1945. They lived on the one first purchased until about the first of January, 1949. They had three sons, John, William, and Owen. John and William both entered the Navy, John in 1942 and William in 1943. Owen was too young for military service. Both were discharged in 1946. Immediately after he returned to civilian life, John went to work with his father on the farms. William entered the Law School of the University of Maryland, graduating and becoming a member of the bar in 1949. In 1948 John seemingly became dissatisfied with farming and his father and mother then decided to engage in some other form of activity. They answered an advertisement of John R. and Alma T. Long, his wife, the appellants, who were endeavoring to sell the Crystal Laundry at Hollywood, St. Mary's County. After some negotiations, a contract was entered into in December, 1948, for the purchase of the

Laundry for the sum of $35,000, of which $5,000 was to be paid in cash, and $10,000 was to be paid by two promissory notes for $5,000 each, maturing respectively January 1, 1950 and January 1, 1951, and secured by a second mortgage on the property involved. The balance of the purchase price was represented by an existing lien indebtedness then outstanding against the Laundry Plant and its equipment in the sum of approximately $20,000. This first lien required instalment payments at the rate of $500 a month. Shortly after the purchase of the Laundry, Mr. and Mrs. Dixon left the farms, having had one sale of personal property in 1948 and another sale of the remainder in January 1949. John and Owen came to the Laundry with their parents and assisted in its operation. John stayed for only a few months, while Owen stayed until his parents left finally in November 1949. Mr. and Mrs. Dixon made the monthly payments of $500 each through July 1949. In that month, Mrs. Dixon became ill, the onset of the illness from which she ultimately died in November 1951. John married in Washington on August 6, 1949, and some two weeks thereafter, on August 17, the two deeds here involved were executed and delivered. John received a deed from his parents for the so-called small farm of 72 acres. The farm referred to as the large farm of 132 acres was deeded to William. Mr. and Mrs. Dixon did not make the monthly payment of $500 in August or any time thereafter. Mrs. Dixon having become much worse in health, Mr. Dixon asked the Longs to take over the Laundry. They ignored this request and, on November 1, 1949, Mr. Dixon abandoned the plant, locked it up, and sent Mr. Long the key by mail. Shortly thereafter, the holder of the first mortgage on the Laundry foreclosed. At the mortgage foreclosure sale held early in 1950, the property brought a price insufficient to pay the mortgage debt. Several months later, Mr. Long located Mr. Dixon in Virginia where he was living, and judgment was entered against him in July 1951 by a Virginia court

for $10,000 less a credit of $210. There followed the creditors' bill which is here involved.

The claim of the sons to a *bona fide* antecedent indebtedness, which was satisfied by the conveyances to them, is as follows: William, from his pay in the Navy as an ensign and lieutenant, and by reason of a period of special service in Washington where he received some $500 a month, was able to save and send home substantial sums of money. In addition, he won between two and three thousand dollars gambling at poker; on one occasion $1,500, and this too was almost all sent home. The moneys so sent were either invested in bonds in his name and his mother's, or deposited in a joint account in her name and his. In 1944, he lent his father and mother $1,300 of his gambling receipts, and in 1945 lent them $1,000. Shortly after he left the Navy, in 1946, he bought six cows for $965, which were ultimately sold to his father and his brother John jointly, for the amount of the purchase price. William's claim, therefore, is that his father and mother were indebted to him in the sum of $2,300 plus one-half of $965, $482.50, or a total of $2,782.50 on August 17, 1949.

John's claim to being a *bona fide* creditor of his father is that he had sent home $700.00 of his pay to his father and mother. His rank was not equal to William's, and neither, apparently, was his gambling skill or luck. When he was mustered out, he received $300 and about that time borrowed $2,000 from the Ridgely Bank. His $1,000 plus the $2,000 borrowed he contributed to an agreed joint venture with his father and mother, in which they were to contribute the two farms, (the large farm was subject to a $4,000 mortgage) and all stock and equipment on both. Armine Dixon and John were to contribute their services to the two farms, and John was to acquire a one-half interest in both farms, one-half interest in the stock and equipment thereon, and a half interest in the profits of the operation. It was further understood and agreed that in the event of liquidation of assets, any indebtedness to William should

be paid from the proceeds of sale of the joint property. John says that, pursuant to this agreement, he entered into the farming operations in 1946, and actively assisted until December 1948, when he went to Hollywood to work in the Laundry. He stayed until April 1949, when he left and married in Washington, in August. Immediately after he was married, he decided he would again try farming, and requested his parents to deed him the small farm in satisfaction of the moneys due him from the partnership venture. This was done by the deed of August 17th, and William received the large farm for his indebtedness.

The first sale of personal property on the farms produced $3,300, and the second, $6,300. John received $100 of the $3,300, his father received $1,600, and $1,500 was put in a joint account of father and son, the father ultimately using the money. John claims, therefore, that he was entitled to one-half of the proceeds of the $6,300 sale, or $3,150, and $1,500 from the first sale, making a total of $4,650. $1,400 of his share was applied in payment of the balance due the Ridgely Bank on his $2,000 note, leaving a net balance due him of $3,250 plus a one-half interest in the equity of the two farms.

The complainants and respondents are in sharp disagreement, as are the experts who testified for each, as to the fair market value of the two farms. The Chancellor found the large farm to be reasonably worth between six and seven thousand dollars, less the mortgage lien of four thousand dollars, and the small farm to be fairly worth between seventy-five hundred and eighty-five hundred dollars. On the Chancellor's appraisal, which to us seems fair and reasonable, John had a debt due him of $3,250 for his share of the personal property, and a half interest in an equity of $2,500 for the larger farm, and $8,000 for the smaller farm, or $5,250. He was thus due $8,500, which is fairly equivalent to the market value of the farm he received.

William's claim is that on the Chancellor's appraisal the fair market value of the large farm, less the mortgage on it, was some $2,500, which is a fair equivalent of the $2,782.50 due him.

John, William and Armine C. Dixon all testified to substantially all the facts which have been recited. There is little corroborative or record evidence other than the fact that John admittedly borrowed the $2,000 from the Ridgely Bank and entered into the farming operations. It is likewise shown that the joint account of William and his mother was opened at the Ridgely Bank by the deposit of $1,153 in 1945. The appellants, on the other hand, challenge the accuracy and probative force of the testimony of the grantees and the father, and show many badges or indicia of fraud as they see it. One of these is that no revenue stamps were affixed to the two deeds. The appellees' answer to this is that William did not know whether stamps were required for a deed which was given for an antecedent debt, and another that the transaction was handled by mail, the deeds being prepared in Caroline County and sent to St. Mary's County for execution. They argue further that if a fraudulent intent had been in the minds and aims of the Dixons, the simple thing to do would have been to put stamps on the deed indicating the consideration, whether or not there had been in fact such consideration, as self-serving record evidence. Another circumstance relied on by the appellants is that, at the time the loans were said to be made by William to his parents in 1945, Armine Dixon had on deposit in a Caroline County bank between four and five thousand dollars, and also owned a mortgage of approximately the same value. William's answer to this is that he had no use for the money while he was in the Navy, and his father preferred to borrow from him, rather than spend his own money. Appellants say also that William, after he married in 1946, paid his own expenses for a three-year law school course, built a home and furnished it at an outlay of some five thousand dollars. William

says that he worked as a real estate salesman while he was attending law school, and that his Navy savings in any event were large enough to permit him to make the loans and to buy his house. Unexplained is a check given by Armine Dixon to William in July 1949 in the amount of $1,194. Appellants say that this indicates that it was the settlement of all moneys due William at that time. Neither William nor his father can recollect what the check was for, except that both are sure it was not for a past due debt, but must have been for some other transaction he handled for his father.

As to John, the appellants contend that the alleged indebtedness is pretended, because no deed to John was executed at the time of the alleged partnership agreement in 1946, the conveyance being delayed until just after a default by the Dixons on the monthly payments due on the Laundry debt. John explains this by saying that he trusted his father; there was no particular occasion for the deed, and in addition, he was receiving under the GI Bill of Rights on-the-job-training-pay as a veteran, and that he would have been ineligible to receive his pay if he had owned the farms.

Appellants rely on the fact that the contribution by the father and mother to the partnership was greatly out of proportion to the $3,000 contributed by John. His answer to this is that a substantial part of the consideration was for his labor on the farm, and, farm labor was scarce, so that contribution was substantial. John also points out that William's indebtedness from the partnership was to be paid. Another check as to which doubt is raised is one in the sum of $1,900, given in October, 1949, from Armine Dixon to John, marked "for one-half interest in sale", indicating that this was in payment of all his interest in the two sales of personal property. John explains, however, that $1,000 of this was to pay him for his one-half interest in certain grain on the two farms at the time of the deed in August, and the remaining $900 was for the purchase of a corn picker for Owen, who had worked in the

Laundry for meagre wages and was about to go back on the farms. There are other suspicious circumstances; one is that the transfers to the sons were made just after the father ceased to make the payments on the Laundry, at a time when he must have seen the handwriting on the wall as to his inability to continue to operate. Another is that between the first of August 1949 and the end of the year, the father had disposed of almost all his assets. He explains this by pointing out that, at the time of the conveyances, he had assets other than the two farms and the Laundry, consisting of accounts receivable at the Laundry of $3,000, cash on hand of $1,200, a bank account in the Leonardtown Bank of $1,900, and one in the Ridgely Bank of $500, making his total resources, in addition to the Laundry, some $6,600. He also points out that the real and indeed the necessary reason he discontinued the Laundry was because of his wife's illness. He was unable to handle the volume of work or get anyone to assist him and, after he ceased operations, he spent large sums of money for his wife— her expenses over-all were between five and six thousand dollars, although some of this was contributed by his mother and by the boys.

The Chancellor found that at the time of the transfers, Armine Dixon was not insolvent or made so by the conveyance of the farms, but pointed out that his solvency or insolvency was not controlling, being only evidence of his intent and that the crucial questions were whether there was a pre-existing debt, a fair consideration, and a lack of participation in any fraudulent intent by the grantees. He made the following findings of fact, after a careful consideration and weighing of the evidence: As to both John and William, he found "That there was good faith on the part of the grantee who accepted the deed as an absolute transfer to him without any secret reservation of interest in the grantors for the future; but for the sole purpose on his part of satisfying the debt due him." Second, at the time of the execution

of the deed, the grantors were not made insolvent by the transfer of the two farms.

As to William, the Chancellor made these findings of fact:

"(1) That at the time of the transfer of the 132 acre farm to William on August 17, 1949 there existed a *bona fide* indebtedness due from the grantors to him of $2,782.50.

"(2) That this indebtedness was satisfied by the deed in question.

"(3) That the satisfied debt was fairly equivalent to the value transferred which was between $2 and 3,000 after deducting the outstanding mortgage."

As to John, he made these findings:

"(1) That at the time of the transfer of the 72 acre farm to John on August 17, 1949 there existed a *bona fide* indebtedness due from the partnership as the owner of the property to him of $8,500.

"(2) That this indebtedness was satisfied by the deed in question.

"(3) That the satisfied debt was fairly equivalent to the fair market value of the farm transferred which was between $7,500 and 8,500."

We think the decisive question in the case is whether the sons participated in any fraudulent intent which might be attributed to the father. In *McCauley v. Shockey, supra,* the court foreshadowed the decision in *Kennard v. Banking & Trust Co., supra,* in discussing this point. It said, 105 Md. at page 645, 66 A. at page 626:

"By a long course of decisions it has been settled that the fraud of the vendor does not vitiate a sale unless the vendee has participated in the fraudulent intent. * * * Some authorities

go so far as to hold that even if the grantee creditor has knowledge that the effect of the conveyance and the intent of the grantor are to delay or defraud other creditors the title of the grantee will not be vitiated if he acts in good faith and does not participate in the fraudulent intent of the grantor."

In *Kennard v. Banking & Trust Co., supra,* the mortgage assailed as a preference was from the husband to the wife. The court found that loans from her to her husband were *bona fide,* and were overdue and unpaid so as to justify the giving of the mortgage as far as that point was concerned. She knew that he was a Director in the bank whose failure contributed to his financial distress. She knew he was a guarantor of the bank and as such compelled to pay some $8,000 which he borrowed from her. The Court said:

"* * * The failure of this bank, his own financial losses, his son's failure and loss of position in the bank, must have been known to Mrs. Kennard. * * *

"Mrs. Kennard accepted from Mr. Kennard the mortgage and assignments on account of the long overdue obligations to her, knowing of his involvement with the bank and knowing that his other creditors would be prevented from recovering their debts in whole or in part by reason of the transfer of all of his property to her, thus rendering himself insolvent."

The court held that the mortgage to the wife could not be set aside, saying:

"There was no deception, artifice and deceit practiced by Mrs. Kennard upon the creditors of Mr. Kennard. She seems to have done nothing but accept a payment on account of the just obligations that were due her, and this cannot be held to constitute fraud or bad faith on her part."

The answer to this appeal turns then on whether the testimony of Armine, William, and John Dixon is to be believed. There are inconsistencies in their testimony, and events which they did not explain. The Chancellor weighed these and concluded: "The Court is unable to find that they are sufficient to impeach or contradict the affirmative evidence." He found that the appellees had met the burden of proof imposed on them by law. We think that if their testimony is believed, the Chancellor was right, and that they did no more than did Mrs. Kennard. The story they told, while in some aspects unlikely, was not impossible, nor so inherently improbable as to be incredible. The Chancellor, after a two-day trial and the opportunity for that period to hear and observe the appellees, determined that they should be believed. We think that this is peculiarly the kind of a case in which the rule so often cited should be honored in the observance and not in the breach, and that the Chancellor's finding of fact, based on the observance of the witnesses, should be affirmed, since we do not find that it was clearly wrong.

*Decree affirmed with costs.*