In re Carmen J. COLANDREA, Debtor.

Carmen J. COLANDREA, Plaintiff,

v.

Dominic C. COLANDREA and John Robinson, Trustee, Defendants.

Dominic C. COLANDREA and John Robinson, Trustee, Counter-Plaintiffs,

v.

UNION HOME LOAN CORPORATION, et al., Counter-Defendants.

Bankruptcy No. 80-2-0002-L.
Adv. No. 80-0167.

United States Bankruptcy Court,
D. Maryland.

Jan. 28, 1982.

Ira C. Wolpert, Deckelbaum, Wolpert & Ogens, Washington, D. C., for debtor.

Gary R. Greenblatt, Schwarz & Greenblatt, Baltimore, Md., for the Chapter 13 Trustee.

David F. Albright, Richard M. Kremen, Gary G. Goldberger, Semmes, Bowen & Semmes, Baltimore, Md., and Thomas A. Pavlinic, Pavlinic & Forman, Glen Burnie, Md., for Dominic C. Colandrea.

Richard A. Kramer, Oxon Hill, Md., for Union Home Loan Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Introduction

HARVEY M. LEBOWITZ, Bankruptcy Judge.

These proceedings arose as a result of the filing by Carmen J. Colandrea ("Carmen") of a Complaint to establish a resulting trust for the benefit of Aida Judisch, Carmen's mother, over a one-third (⅓rd) interest held by Carmen in certain real property located in Milford, Connecticut. John Robinson, the Chapter 13 Trustee in Carmen's Bankruptcy case, and Dominic Colandrea ("Do-

minic"), a judgment creditor of Carmen, were named as defendants in that complaint. Dominic filed an answer and a two-count counterclaim. Counterclaim No. I requested the Court to determine that Carmen had a beneficial and legal interest in the Milford, Connecticut property. Counterclaim No. II requested the court to set aside and expunge a second mortgage, granted by Carmen to Union Home Loan Corporation ("Union Home") on real property owned by Carmen in Columbia, Maryland, on the basis that the conveyance of the second mortgage constituted an alleged fraudulent conveyance under state law. As a result of the counterclaims, Carmen, her mother and sister, who each held a one-third (⅓rd) interest in the Milford, Connecticut property along with Carmen, were named as Counter-Defendants. Carmen subsequently amended her complaint in the pretrial order filed in these proceedings on December 12, 1980 whereby she additionally sought to avoid Dominic's judicial lien encumbering her one-third (⅓rd) interest in the Milford, Connecticut property. At the direction of the Court, the Counterclaim was subsequently amended to name the Chapter 13 Trustee as a Counter-Plaintiff.

On Motion, the Complaint to impose a resulting trust, avoidance of the judicial lien as a preference and counterclaim No. I (resulting trust case) were severed from Counterclaim No. II (second mortgage case). After a trial on the merits of the issues of the resulting trust case, this Court found the Debtor, Carmen, possesses a one-third (⅓rd) interest as a joint tenant with right of survivorship in the Milford, Connecticut property and denied her request to impose a resulting trust in favor of Aida Judisch. At the conclusion of the resulting trust case, the Court expressly reserved any ruling on the preference issues so as to consider the evidence as to Carmen's solvency to be adduced during the trial of the second mortgage case. A separate trial was held with respect to the second mortgage case at which time testimony was heard, evidence produced and the case was taken under advisement pending the filing of

memoranda and final arguments of counsel. Memoranda have now been filed by all parties and arguments heard. The findings and conclusions hereinafter set forth deal with the issues raised in Counterclaim No. II, the avoidance and retention powers of the Trustee with respect to the preference action, and the priority as between the Trustee and Dominic in the event this Court finds the Union Home mortgage to be a fraudulent conveyance.

## FINDINGS OF FACT

### I. *Counter-Plaintiff's Counterclaim No. II*

1. On April 4, 1979, Carmen executed a second mortgage to and in favor of Union Home in the principal face amount of $72,800.00.

2. By the execution of the second mortgage, Carmen conveyed to Union Home as security for the $72,800.00 debt therein recited, certain property owned by her and located in Howard County, Maryland, *to-wit*: Lot numbered 199 in a subdivision known as "Amended Plat, Columbia, Village of Wilde Lake Subdivision, Section One, Bryant Wood," which property is also known as 10461 Waterfowl Terrace, Columbia, Maryland.

3. The second mortgage was duly recorded among the Land Records of Howard County, Maryland, in Liber 0934 at Folio 205.

4. Simultaneously with the execution of the second mortgage, Carmen also executed a mortgage note in the face amount of $72,800.00, dated April 4, 1979, payable to Union Home.

5. Richard J. Colandrea ("Richard") was identified on said mortgage note, and was and is in fact a "maker" of the note. In addition, the Court finds that Richard executed said note in this capacity.

6. Carmen was also identified on said mortgage note as a "maker."

7. The settlement on the second mortgage loan transaction occurred on April 4, 1979, in the offices of Union Home at 10227 Wincopin Circle, Suite 326, Columbia, Maryland.

8. A substantial part of the business of Union Home consists of the making of second mortgage loans.

9. Union Home, as part of its normal business procedures, obtains a loan application, personal financial statement, and credit report from all persons who apply to it for a loan.

10. Union Home requested and received a loan application and a personal financial statement from Richard in connection with the loan, and obtained a credit report on him.

11. Union Home requested and received a loan application from Carmen, but did not request that she fill out or furnish a personal financial statement in connection with the loan; nor did Union Home obtain a credit report on Carmen. No personal financial statement was requested from Carmen because her only involvement in the loan transaction was the using of her property as security for the loan to Richard.

12. Richard's loan application lists real estate owned with a market value of $448,000 and mortgages thereon in the amount of $295,050.

13. The real property owned by Richard and listed by him on his personal financial statement would have, in the aggregate, provided ample security to Union Home without the necessity of the use of the property owned by Carmen as security or additional security.

14. Union Home's specific instructions to Bell & Cornelius, the attorneys retained by Union Home to handle the preliminary title and record search and later settlement for this loan, directed them to disburse the net loan proceeds either to Richard or to Bell & Cornelius and Richard.

15. The net loan proceeds disbursed totalled $69,876.59. The check for these proceeds was made payable to Carmen and Richard.

16. A title and record search in The Circuit Court for Howard County, Maryland was conducted against Carmen by Bell & Cornelius as attorneys for Union Home in

connection with the taking of a second mortgage lien on Carmen's Columbia, Maryland property.

17. Shortly prior to settlement James Clifford, an attorney with the law firm of Bell & Cornelius, examined the title abstract notes for the Waterfowl Terrace property owned by Carmen in his capacity as agent for U. S. Life Title Insurance Company. Mr. Clifford also conducted the settlement for the loan on April 4, 1979 at the office of Union Home.

18. Prior to the examination of the title to the subject property, James Clifford had examined or abstracted over 1000 property titles and therefore had substantial experience in the examination or abstracting of titles to real estate.

19. This search revealed the pendency of litigation by Dominic against Carmen based on fraud. At the time of the search this litigation was on appeal to The Maryland Court of Special Appeals.

20. In handling the loan transaction, Bell & Cornelius was acting as a dual agent. Not only did the firm act as agent for U. S. Life Title Insurance Company in performing the record search, but it also acted as agent for Union Home. Accordingly, the firm's knowledge of the pending litigation is imputed to Union Home.

21. At the time of the record search a judgment had been entered in favor of Dominic, the Plaintiff, against Cortland, Ltd. and Carmen Management Company, and in favor of Carmen, the remaining Defendant. On May 9, 1979, approximately one month subsequent to the settlement on the loan transaction, the judgment of The Circuit Court for Howard County was affirmed as to Cortland, Ltd. and Carmen Management Company, Inc., and reversed as to Carmen and remanded for judgment against her in favor of Dominic.

22. Based on his experience and his understanding of the generally accepted procedure for examination and evaluation of real property titles, James Clifford determined that Carmen was vested with good fee simple title to the Waterfowl Terrace property and that the pending appeal from the judgment of the Circuit Court for Howard County, Maryland, did not represent a lien, encumbrance or objection on the title to said Waterfowl Terrace property such as would prevent Union Home from securing a valid second lien on the property.

23. Union Home apparently had no actual knowledge as to the status of the title to the Waterfowl Terrace property, including but not limited to the content or substance of the title abstract and examination conducted and performed by James Clifford at any time prior to the April 4, 1979 settlement. However, the Circuit Court case was a matter of public record and James Clifford, agent of Union Home, did have actual knowledge of the suit and the pending appeal.

24. One or more companies controlled by Richard and Carmen had referred business to Union Home over the course of several years before the loan. At the time it granted the loan, Union Home was aware of this fact, and knew of Richard and Carmen's control of the companies.

25. Loan applications filed by Richard and Carmen were reviewed by Frank Conlon, manager of the Union Home Columbia branch, Edward Hill, II, Union Home's Regional Manager, and John Walker, President of Union Home.

26. The Union Home loan processing report was reviewed and signed by both Edward Hill, II and John Walker.

27. The purpose of the loan, to Union Home's knowledge, and consistent with the representations made to it by Richard both orally and in writing, was to enable Richard to purchase an office building, but this office building was never purchased by Richard.

28. According to the testimony of John Walker, President of Union Home, the loan was being made to Richard, and Carmen was merely using her property as security for her son's loan.

29. It was Mr. Walker's understanding that Richard was to repay the loan.

30. Monthly repayments were made towards the Union Home loan until April, 1980.

31. All repayments on the Union Home loan were made by checks signed by Richard.

32. In April, 1980, the loan account went into default and no payments have been made since that time.

33. Union Home did not actively pursue collection efforts against Richard for the amounts due on the loan account.

34. Union Home knew, at the latest by September of 1980, that Carmen's bankruptcy did not prevent it from pursuing collection efforts against Richard.

35. Nonetheless, collection efforts were yet to be instituted by Union Home against Richard as of the December 18, 1980, the first day of trial on Counter-Plaintiff's Counterclaim No. II.

36. At least one or two repayments were made towards the loan account between the time Carmen filed her bankruptcy petition and the time when the loan account became in default.

37. On or about April 4, 1979, the date of closing for the loan, the loan proceeds check payable to both Carmen and Richard and endorsed by them was deposited in First National Bank of Maryland account No. 8688705, an account in the name of Cortland Realty, Ltd. t/a Carmen Management Co.

38. According to the testimony of Carmen, there is no corporation in existence with the name of Cortland Realty, Ltd. This is further borne out by certifications from the State Department of Assessments and Taxation.

39. In April of 1979, and continuing until the time of trial, there was no corporation registered or qualified with the Maryland State Department of Assessments and Taxation under the name Carmen Management Co., (as distinguished from Carmen Management Company, Inc.)

40. Dominic is a judgment creditor of Carmen, in the amount of $81,500, plus interest and costs, by virtue of the judgments rendered in the Court of Special Appeals of Maryland in August and December of 1979.

41. Dominic is also a judgment creditor of Cortland, Ltd. (not to be confused with the non-existing Cortland Realty, Ltd.) and Carmen Management Company, Inc.

42. According to the testimony of Carmen, Richard is the one who signs all checks on the account at First National Bank (No. 8688705).

43. Richard wrote all checks transferring the loan proceeds from First National Bank account No. 8688705 to other uses.

44. The original bankruptcy schedules filed by Cortland, Ltd. in its bankruptcy proceeding showed a $35,000 loan from Richard to Cortland, Ltd., and the partial repayment by Cortland, Ltd. to him of $10,-000.

45. The original bankruptcy schedules filed by Cortland, Ltd. in its bankruptcy had been prepared and reviewed by Richard, Carmen, and an attorney for Cortland, Ltd.

46. Richard and Carmen assert that the $35,000 was mistakenly listed as a loan from Richard, and that the error was not discovered until depositions were taken in this adversary proceeding.

47. Despite this discovery, the Cortland, Ltd. bankruptcy schedule was not amended to make Carmen the lender of the $35,000 to Cortland, Ltd. until after the commencement of the actual trial on Dominic's Counterclaim No. II.

48. Carmen's bankruptcy schedules, prepared and reviewed by her and her attorney, do not show a debt of either $35,000 or $25,000 due her from Cortland, Ltd.

49. No evidence of any kind, except for the amended Cortland, Ltd. schedules, and the testimony of Carmen and Richard, was introduced to prove that the $35,000 loan was made by Carmen.

50. The Court finds from the evidence that Richard treated the $35,000 as his funds and considered the loan to Cortland, Ltd. as a loan made by him from his funds.

51. The Union Home loan proceeds deposited in the First National Bank account were entered on a ledger labeled by Richard as the "Corvette account." The "Corvette account" is merely a ledger account and not the name of any bank account maintained by Richard, Carmen or any of the companies which they control. Entries in the "Corvette account" are made by Richard or on his instructions and Richard made a year-end adjustment to the "Corvette account" which had the affect of eliminating a balance as of 1979 of $16,000 from the account. No evidence was introduced to show the justification for the year-end adjustment.

52. No documents were produced by Carmen to establish which, if any, of the loan proceeds deposited in the "Corvette account" were her funds.

53. No documents were produced by Carmen to establish that she used or controlled any of the loan proceeds deposited in the "Corvette account."

54. Even if some money in the "Corvette account" belonged to Carmen, it is impossible to determine from either the statements of First National Bank or the ledger card of the "Corvette account" which funds belonged to Carmen and which funds belonged to others, including Richard.

55. No documents or other writings of any kind were produced by Carmen to trace any usage or ownership of the loan proceeds to her.

56. No documents or other writings of any kind were produced setting forth a statement of the account between Richard and Carmen.

57. The $35,000 loan to Cortland, Ltd. from the Union Home loan proceeds was deposited in account number 100–571–5 at the Columbia Bank & Trust Co. in April of 1979; this account was in the name of the non-existing corporation Cortland Realty, Ltd.

58. No corporation known as Cortland Realty, Ltd. was registered or qualified to do business in Maryland in April of 1979, or thereafter.

59. Neither Cortland Realty, Ltd. nor Carmen Management Co. was either a legal or a de facto corporation in April of 1979, or thereafter.

60. No evidence was introduced by Carmen to establish that either of these entities were de facto corporations.

61. Richard transferred $30,000 of the loan proceeds to account number 10810382 at Baltimore Federal Savings & Loan Association.

62. Although the account at Baltimore Federal may have been in both Richard and Carmen's name, it appears from the evidence that during all times pertinent to this case, Richard made the principal deposits and withdrawals from that account.

63. Richard used at least a portion of these transferred proceeds for his individual, personal benefit, including the buying of real property, paying of personal debts, paying for his sister's wedding, and paying of his taxes.

64. It appears from the evidence that $10,000 of the loan proceeds were then transferred by Richard to either First National Bank account number 8688705 or Columbia Bank & Trust Co. account number 100–571–5.

65(a). Based upon a review and consideration of all of the facts the Court finds:

(1) That the loan was made by Union Home to Richard and not to Carmen, with Carmen using her Columbia, Maryland property as collateral for the loan to her son, Richard.

(2) That the proceeds of the loan from Union Home did not go to Carmen nor were they for her use and benefit.

(3) That, notwithstanding any testimony of either Richard or Carmen, Richard treated the proceeds of the loan as his sole and exclusive property, and maintained complete control over the accounts and the disbursements of the loan funds and the court is not at all convinced that his actions were taken upon the instructions of Carmen.

(4) That Carmen did not receive fair consideration from Union Home in return for

the second mortgage on her Columbia, Maryland property.

(5) That the burden of showing that Carmen' was solvent on April 4, 1979 rests on Union Home.

(b) The Court further finds from all of the evidence that the utilization of bank accounts maintained in the name of non-existent corporations or entities, the use of tradename accounts and ledger accounts and the similarity between the corporate names and the tradenames, all had the effect of creating confusion and of obscuring and concealing from Dominic and other creditors of Carmen, the receipts of the funds, their location, their use, their ownership and any interests which others may have in such funds.

66. Although Richard told Union Home that he wanted the loan to purchase an office building on Georgia Avenue in Olney, Maryland, and submitted a lease containing an option to purchase and related correspondence to Union Home, this office building was never purchased.

67. Cortland, Ltd. had at one time a written option to purchase the Georgia Avenue office building.

68. This written option commenced on February 28, 1977, and expired six months later. On September 28, 1978, the owners of this office building by letter gave Cortland, Ltd. 15 days in which to exercise its option.

69. Cortland, Ltd. did not exercise its option to purchase the Georgia Avenue property. By April of 1979, the written option to purchase the property had expired, although there was testimony by Richard that it continued in effect until there was a default under the lease in the fall of 1979.

70. The Court finds from all of the evidence that, except for the statement required by Union Home that the loan was for a commercial purpose, it was entirely immaterial to Union Home whether Richard, individually, or in conjunction with any other persons, was going to or even intended to purchase the Olney property since that property was not being taken by Union Home as security for the loan and, in fact, the documents in Union Home's file would have reflected that the written options had, on their face, expired.

71. The Court further finds that if the purchase of the Olney property were significant and material to Union Home, it would have taken steps to assure that the proceeds were used for that purpose and taken this property as collateral.

72. The Court also finds that Union Home, in making the loan to Richard, would appear to have had ample security by taking a mortgage on properties owned by Richard, as shown on his financial statement. In addition, the Court finds that except for possible inconvenience and additional costs, which would have been paid by the borrower in any event, no substantive business purpose of Union Home would be served by taking a mortgage on the property of Carmen. The Court is persuaded that but for the fact that Carmen's property was being taken as security for the loan to Richard, Carmen's name would not have been on either the note or the check.

73. The bankruptcy schedules filed by Carmen show that as of December of 1979, her liabilities substantially exceeded her assets. The Court finds from Counter-Plaintiff's Exhibit # 25 that the total assets appear to be approximately $160,000 and the liabilities approximately $266,000.

74. Carmen did not establish that she had sufficient assets with which to pay all of her debts in April of 1979 after she gave Union Home the second mortgage lien on her Columbia, Maryland residence.

75. No documentation was introduced by Carmen to show her assets and liabilities as of April of 1979, after she gave Union Home the second mortgage lien.

76. Although Carmen testified that she had prepared a list of her assets as of April of 1979, such list was never introduced or produced at trial.

77. Carmen never stated any total figures for her net worth, or her assets and liabilities as of April of 1979.

78. Although there were suggestions made by Carmen that documentary evidence existed which would show in a definitive fashion (a) the analysis of the "Corvette account," and (b) her assets and liabilities on April 4, 1979, no such explicit documentary evidence was produced.

79. In considering the solvency of Carmen as of April 4, 1979, the Court finds that any interest she may have had on that date in Stevens Common Limited Partnership had no asset value.

80. On her Chapter 13 Statement (Counter-Plaintiff's Exhibit # 25) Carmen states that she holds 100% of the stock in Cortland, Ltd., an insolvent company, now out of business and which has filed a bankruptcy petition in this Court.

81. No documents were produced or introduced that would show the value of the assets and the extent of the liabilities of Cortland, Ltd. as of April of 1979, nor was any testimony adduced from any qualified expert or any disinterested person which would tend to establish the value of the tangible or intangible assets of Cortland, Ltd.

82. Union Home requests the Court to find that on April 4, 1979, Cortland, Ltd. had a net value of $171,940, being the difference between its total assets and total liabilities. In order to achieve this result, Union Home asks the Court to find, based on the testimony of Carmen, that one of the assets of Cortland, Ltd. was its "good will" which should be valued at $250,000. No documents were produced or introduced to verify any prospective offers to purchase Cortland, Ltd. by third parties. The Bankruptcy Schedule B-3 of Cortland, Ltd., of which this Court has taken judicial notice, shows good will, tradename, and logo to be valued at zero as of March 12, 1980, the date on which Cortland, Ltd. filed its petition in bankruptcy. Under these circumstances, the Court cannot find that the good will, tradename and logo had a value of $250,000 on April 4, 1979. The Court, therefore, finds that the good will, tradename and logo of Cortland, Ltd. on April 4, 1979 was of no material value and, as a result its total liabilities were substantially greater than its total assets as of said date.

83. On her Chapter 13 Statement, Carmen indicates that she had a secured claim against Cortland, Ltd. in April of 1979. Her claim appears to be in a third lien position, however, and the two prior liens on the same collateral appear to be greater than the value of the collateral thereby causing her claim for all practical purposes, to be unsecured.

84. In April of 1979, after she granted Union Home the second mortgage lien on her Columbia, Maryland property, the fair market value of Carmen's assets was less than the amount required to pay her probable liability on her existing debts as they became absolute and matured.

85. The conveyance of the second mortgage lien to Union Home rendered Carmen insolvent in April of 1979.

86. After the second mortgage lien, the value of the assets remaining in Carmen's hands was unreasonably small capital for the business or businesses in which Carmen was engaged or about to become engaged.

87. In April of 1979, Carmen intended or believed that she would incur debts beyond her ability to pay as they matured.

88. In April of 1979, the second mortgage lien was granted to Union Home with actual intent to hinder, delay or defraud present or future creditors.

89. The Court finds, as gathered from the various facts and incidents composing the transaction and its environment, that Union Home had knowledge of or participated in the fraud being perpetrated by Carmen and her son, Richard.

II. *Findings With Respect To The Trustee's Claims*

90. Carmen filed a petition for relief under Chapter 13 of the United States Bankruptcy Code on January 2, 1980. John Robinson was appointed Chapter 13 Trustee by Order of this Court on March 4, 1980.

91. In August of 1979, Defendant and Counter-Plaintiff Dominic obtained a judg-

ment of The Circuit Court for Howard County, Maryland against the Counter-Defendant Carmen.

92. The Court has heretofore found that Carmen, at all times pertinent to these proceedings had a one-third (⅓rd) interest as a joint tenant in that real estate known as 11 Driftwood Lane, Milford, Connecticut.

93. On or about November 20, 1979, Dominic recorded his Maryland judgment in the land records office in the Connecticut county where the Milford property was located.

94. Carmen was insolvent at the time that Dominic obtained his judgment lien against Carmen's one-third (⅓rd) interest in the Milford property.

95. The Milford property had a present market value of $90,000.00 as of the time of the filing of the petition and at the time Dominic obtained his judgment lien against said property.

96. The value of Carmen's one-third (⅓rd) interest in the Milford property, in a bankruptcy proceeding, was $30,000 or less, because her interest was that of a joint tenant.

97. At the time the petition for relief under Chapter 13 was filed by Carmen, Dominic had the following claims: (i) a secured claim by virtue of a judgment lien against Carmen's interest in the Milford, Connecticut property; (ii) a secured claim by virtue of his judgment lien against the Debtor's residence located at 10461 Waterfowl Terrace, Columbia, Maryland to the extent of any equity the Debtor may have had after the first and second mortgages encumbering said property and the claimed exemption of Carmen; and (iii) an unsecured claim for the balance.

98. It was stipulated that there would have been testimony that the Waterfowl Terrace property would have had a fair market value of $135,000.

99. The schedules of the Debtor reflect that there is a first mortgage encumbering the Waterfowl Terrace property in the amount of $46,622 and the Union Home second mortgage encumbering said property in the amount of $72,164.93.

100. The Debtor has elected to exempt her equity interest in the Waterfowl Terrace property in the amount of $6,139.07.

101. The total encumberances, including claimed exemption of the Debtor against the Waterfowl Terrace property that takes priority over Dominic's claim, amount to $124,926.

102. Carmen's schedules reflect that she had approximately $147,594.44 of unsecured debt and $118,806.93 of secured debt, assuming that Dominic's claim reduced to judgment is wholly unsecured.

103. Carmen was insolvent at the time she filed her petition for relief under Chapter 13 of the United States Bankruptcy Code.

104. The value of Carmen's assets which could be distributed under a Chapter 7 proceeding totaled $10,000, the proceeds from the sale of Stevens Common Limited Partnership liquidation.

105. Dominic's judgment lien on the Connecticut property enables him to receive more than he would have received if this case were a case under Chapter 7, that transfer had not been made, and he received payment on his debt pursuant to the provisions of the Bankruptcy Code.

106. If this Court finds that the granting of a second mortgage by Carmen to Union Home was a fraudulent conveyance as to Dominic, then it was a fraudulent conveyance as to the Trustee.

## CONCLUSIONS OF LAW

The facts in this case, being as they are somewhat unusual, present questions of law that are as yet undecided in this District under The Bankruptcy Reform Act of 1978, Pub.L.No.95–598, 92 Stat. 2549 (1978) (now codified in part at 11 U.S.C. §§ 101–1330 (Supp.IV 1980)) (the "Code"). The most significant of these questions concerns the contention made in this case by both the Plaintiff-Counterdefendant, Carmen, and one of the Defendants-Counterplaintiffs, Dominic, that a Chapter 13 Trustee lacks

the standing to enforce either § 547 or § 548 of the Code. The Court disagrees for the reasons that appear anon.

### 1. Dominic Colandrea's Claims of Fraudulent Conveyance Under Maryland Law.

Dominic's Counterclaim seeking to set aside Union Home's second mortgage as a fraudulent conveyance raises legal questions as old as the common law itself. The Maryland Uniform Fraudulent Conveyance Act, Md. Com. Law Code Ann. §§ 15–201 to 15–214 (1975) (the "Maryland Uniform Act"), is in large part a restatement of The Statute Against Fraudulent Deeds & Alienations, 13 Eliz., c.5 (1570). *Beccio v. Tawnmoore Apartments, Inc.*, 265 Md. 297, 289 A.2d 311 (1972); *Damazo v. Wahby*, 269 Md. 252, 256 n.1, 305 A.2d 138, 141 n.1 (1973). The Statute of Elizabeth was the basis for Maryland fraudulent conveyance actions as late as the early portion of this century. *See, e.g., Arthur & Boyle v. Morrow Bros.*, 131 Md. 59, 101 A. 777 (1917). The indicia or badges of fraud first outlined in *Twyne's Case*, 76 Eng.Rep. 809, 812–14 (Star Chamber 1601), continue to be recognized by the Maryland courts as part of the law of fraudulent conveyances under the Maryland Uniform Act. *Berger v. Hi-Gear Tire & Auto Supply, Inc.*, 257 Md. 470, 475–77, 263 A.2d 507, 510 (1970). Moreover, Maryland law continues to recognize a body of other common law concepts as having been incorporated by the Maryland Uniform Act.

■ The Counterclaim filed by Dominic relies upon sections 15–204, 15–205, 15–206, and 15–207 of the Maryland Uniform Act as bases upon which the Union Home mortgage may be set aside. Section 15–204 provides that:

Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

Under § 15–204, the intent of the transferor is irrelevant so long as the Plaintiff shows the absence of fair consideration and the post-conveyance insolvency of the transferor. The prerequisites for a finding of fair consideration under the Maryland Uniform Act are as follows:

Fair consideration is given for property or an obligation if:

(1) In exchange for the property or obligation, as a fair equivalent for it and in good faith, property is conveyed or an antecedent debt is satisfied; or

(2) The property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained.

Md.Com.Law Code Ann. § 15–203 (1975). The findings of fact made by this Court make clear that Dominic proved that no consideration flowed to Carmen in exchange for the mortgage. Under such circumstances there must necessarily be an absence of fair consideration under either test established by § 15–203. *Cf. Berger v. Hi-Gear Tire & Auto Supply, Inc.*, 257 Md. 470, 477, 263 A.2d 507, 510 (1970).

■ Proof of the absence of any consideration whatsoever, places significant burdens upon the transferee to establish the validity of the transfer. The law under both the Statute of Elizabeth and the Maryland Uniform Act is well settled "that a voluntary conveyance is *prima facie* in fraud of existing creditors of the grantor without regard to his actual intention." *Westminster Savings Bank v. Sauble*, 183 Md. 628, 631, 39 A.2d 862, 863 (1944). Because the transaction is *prima facie* fraudulent, Maryland law places the burden of proof as to the solvency of the transferor upon the party claiming under the conveyance. *Lacey v. Van Royen*, 259 Md. 80, 92–93, 267 A.2d 91, 97–98 (1970). The Maryland Uniform Act sets up the definition of "insolvency" as a showing that "the present fair market value of [the transferor's] assets is less than the amount required to pay his probable liability on his existing debts as they become absolute and matured." Md.Com.Law Code Ann. § 15–

202(a) (1975). As the Court of Appeals of Maryland observed in *Lacey v. Van Royen*, the shifting of the burden as to "solvency" requires the transferee to prove that the transferor retained property, exclusive of that conveyed away, sufficient to pay his debts. 259 Md. at 94, 267 A.2d at 97. Thus, Union Home has the burden of proof on the issue of Carmen's solvency following the April 4, 1979 conveyance of the second mortgage. As this Court's findings of fact make clear, no evidence was adduced tending to show that Carmen was solvent subsequent to granting the second mortgage to Union Home. Moreover, substantial credible documentary evidence was introduced that demonstrates convincingly that Carmen was insolvent after that transfer.

Under Maryland law it has often been said that the intent of the transferor cannot vitiate or impair a conveyance unless the transferee participates in the fraudulent intent. *Long v. Dixon*, 201 Md. 321, 93 A.2d 758 (1953); *McCauley v. Shockey*, 105 Md. 641, 66 A. 625 (1907). This rule has been frequently applied by Maryland courts under circumstances making it difficult to ascertain whether it applies equally to cases of actual intent to hinder, delay or defraud creditors and ones involving such intent presumed in law. The Court will assume without deciding that the nonparticipation of the transferee does constitute a defense to an action under § 15–204. In addition, for the purpose of the analysis set out in the paragraph below the Court will disregard the finding that Union Home had knowledge of or participated in the fraud perpetrated by Carmen and Richard against her creditors.

Proof of the transferee's participation in the fraudulent intent of the transferee is often difficult. As the *Shockey* court observed,

> From the nature of the case, a creditor attempting to set aside a conveyance as fraudulent can seldom prove as an independent fact the knowledge of or participation in the fraud of the grantor by the grantee. That knowledge or participation must be gathered from the various facts and incidents composing the transactions and its environment. The primary presumption here as elsewhere is in favor of innocence and good faith, but a state of facts may be shown which will negative that presumption and cast upon the grantee the burden of proving his good faith and nonparticipation in the fraudulent purpose of the grantor.

105 Md. at 646, 66 A. at 628. In accordance with the *Shockey* ruling, the badges of fraud set out by the Star Chamber in *Twyne's Case* remain applicable in Maryland for the purpose of shifting the burden of proof to the transferee as to his *bona fides* with regard to the conveyance. *Berger v. Hi-Gear Tire & Auto Supply, Inc.*, 257 Md. 470, 263 A.2d 507 (1970). In *Berger*, the Court of Appeals of Maryland stated that,

> The facts which are recognized indicia of fraud are numerous, no court could pretend to anticipate or catalog them all. Among the generally recognized badges of fraud are the insolvency or indebtedness of the transferor, lack of consideration for the conveyance, relationship between the transferor and the transferee, the pendency or threat of litigation, secrecy or concealment, departure from usual method of business, the transfer of the debtor's entire estate, the reservation of benefit to the transferor, and the retention by the debtor of the possession of the property.

> Although it has been said that a single badge of fraud may stamp a transaction as fraudulent, it is more generally held that while one circumstance recognized as a badge of fraud may not alone prove fraud, where there is a concurrence of several such badges of fraud inference of fraud may be warranted.

257 Md. at 476–77, 263 A.2d at 510. The Court's findings make clear that eight of the badges of fraud are present in this case: (1) Carmen was insolvent subsequent to the transfer; (2) Carmen received no consideration from Union Home for the conveyance of the second mortgage; (3) A business relationship existed between Union Home

and Carmen's various business enterprises; (4) At the time of the conveyance, Dominic's litigation against Carmen was on appeal to the Maryland Court of Special Appeals; (5) Union Home departed from its usual business practices in that although Carmen was required to make a loan application, no financial statement or credit report as to her were sought by Union Home; (6) Numerous bank accounts and ficticious entities were utilized to disguise the disbursement of the funds by Richard; (7) The second mortgage conveyed a substantial portion of Carmen's unencumbered assets; (8) The conveyance by mortgage permitted Carmen to dispossess her unencumbered interest in the real estate while permitting her to remain in possession of the property. Union Home produced no evidence tending to negate the inference of its participation in Carmen's intent created by the concurrence of substantially *all* of the badges of fraud outlined in *Berger.* Accordingly, the Court concludes that Carmen's conveyance of the second mortgage to Union Home was a fraudulent conveyance under § 15–204 of the Maryland Act because it was made without fair consideration, it rendered Carmen insolvent, and Union Home was not an innocent participant in her fraudulent intent.

The provisions of § 15–205 and § 15–206 require proof similar to that necessary to set aside a conveyance under § 15–204. The distinguishing feature of § 15–205 is a finding that the transferor "is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital." After considering the evidence produced at trial, the Court has made such a finding. The significant finding under § 15–206 is that the transferor "who makes the conveyance or who enters into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature." The Court so found. Thus the second mortgage was also a fraudulent conveyance under both § 15–205 and § 15–206 of the Maryland Uniform Act.

A like result is dictated with respect to setting aside the second mortgage under § 15–207 on the basis of actual intent "to hinder, delay, or defraud present or future creditors." After considering all the evidence, the Court found that Carmen had such actual intent when granting the second mortgage to Union Home. As the Court concluded above, the concurrence of the numerous badges of fraud in this case preclude any finding or conclusion that Union Home was a good faith transferee of the sort against whom The Maryland Uniform Act cannot be asserted. Moreover, the Court expressly made the finding that Union Home had knowledge of or participated in the fraud perpetrated by Carmen and Richard against her creditors. Accordingly, the Court concludes that the second mortgage was in addition a fraudulent conveyance under § 15–207.

2. The Trustee's Claims of Fraudulent Conveyance Under Bankruptcy Law.

The Chapter 13 Trustee asserts that proof of a fraudulent conveyance under the Maryland Uniform Act compels the conclusion that the transfer is avoidable under 11 U.S.C. § 548 (Supp.IV 1980). Section 548 provides that a Trustee may avoid a transfer made within one year before the filing of the bankruptcy petition on grounds virtually identical to those set out in The Uniform Fraudulent Conveyances Act. *See generally* 4 Collier on Bankruptcy § 548.-01[2] (15th ed. 1981). The findings of fact previously made by the Court make it evident that in this case Union Home's mortgage is avoidable under any or all of the tests established by § 548 so long as a Chapter 13 Trustee has standing to bring such an action.

Nothing in the provisions of Chapter 13 of the Code expressly limits a Chapter 13 Trustee's powers to those set forth only in that Chapter. Furthermore, the Code taken as a whole makes it evident that a Chapter 13 Trustee possesses powers established elsewhere in the Code. Section 548(a) provides without limitation that "the trustee may" utilize the section to avoid

transfers. The Code also provides that a transfer avoided under § 548 is automatically "preserved for the benefit of the estate." 11 U.S.C. § 551 (Supp.IV 1980). In addition, the Code unequivocally provides that § 548 and § 551 are applicable in Chapter 13 cases. 11 U.S.C. § 103(a) (Supp.IV 1980). With the exception of the duty to reduce the estate to money, a Chapter 13 Trustee has substantially all the duties of a Chapter 7 Trustee. 11 U.S.C. § 1302(b)(1) (Supp.IV 1980). The Chapter 13 Trustee is charged with additional duties as well, including the obligation imposed by § 1302(b)(2)(B) to appear and be heard at the confirmation hearing.[1] A significant aspect of the Chapter 13 confirmation hearing is the determination of whether the plan satisfies the "best interest" of unsecured creditors test imposed by § 1325(a)(4).[2] Cf. In re Gale, 8 B.R. 960 (Bkrtcy., D.Md.1981). Were the Chapter 13 Trustee without standing to enforce the powers granted to a trustee under § 548, he would be unable to determine with certainty whether the Chapter 13 plan conformed with the "best interest" test. Such a determination rests upon the Trustee's ability to place a conclusive value on the Debtor's estate. Valuation of the Debtor's estate necessarily requires that the Trustee be able to prosecute actions to determine with legal finality whether transfers of property by the Debtor are valid as against the estate. The provisions of the Code embodied in § 542 through § 554, granting the Trustee extensive avoidance powers including setting aside preferences and fraudulent conveyances among others, are the very essence of the Trustee's role in the "comprehensive [Congressional] scheme for sorting out the competing claims and interests present in bankruptcy proceedings." In re Ryan, 15 B.R. 514, 520 (Bkrtcy., D.Md.1981). The principal safeguard for the unsecured creditors in a Chapter 13 proceeding is the "best interest" test of § 1325(a)(4). Congress did not intend that the Chapter 13 Trustee should be powerless to protect their interest. The Court concludes, therefore, that a Chapter 13 Trustee has standing to enforce § 548, and that the Union Home second mortgage was an avoidable fraudulent conveyance as to the Chapter 13 Trustee.

Dominic has taken the position that once Union Home's second mortgage is avoided, the estate's lien position should be subordinate to his pre-existing judgment lien on the property. He relies in large part upon In re Arrington Lumber, Inc., 180 F.Supp. 543 (E.D.Va.1960), and In re American Fuel & Power Co., 151 F.2d 470 (6th Cir. 1945), both cases decided prior to adoption of The Bankruptcy Reform Act of 1978. Both Arrington Lumber and American Fuel were overruled by § 551 of the Code. 4 Collier on Bankruptcy § 551.01, at 551–1 n.3 (15th ed. 1981). Section 551 automatically preserves the lien for the benefit of the estate, and prevents junior lienors from improving their position at the expense of the estate. H.R.Rep.No.95–595, 95th Cong. 1st Sess. 376 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Thus, the lien set aside by the Chapter 13 Trustee is preserved for the estate, and the estate is vested with the lien position of Union Home that is superior to the one on record in Dominic's favor.

---

1. The fundamental role of a Trustee is to act as "the representative of the estate." 11 U.S.C. § 323(a) (Supp.IV 1980). This role is vested in the Trustee regardless of the Chapter under which he is appointed. 11 U.S.C. § 103(a) (Supp.IV 1980). An "estate" is created as a matter of law upon the commencement of a case under the Code without regard to the applicable Chapter. 11 U.S.C. § 541(a) (Supp.IV 1980).

2. The "best interest" test is set out in the Code as follows:

The Court shall confirm a plan if—

. . . .

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

11 U.S.C. § 1325(a)(4) (Supp.IV 1980).

3. The Trustee's Claims of Preference With Respect to Dominic's Lien on the Milford, Connecticut Real Estate.

The Court concludes at the outset that for the reasons stated *supra* a Chapter 13 Trustee has standing to sue as the representative of the estate to avoid preferential transfers under 11 U.S.C. § 547 (Supp.IV 1980). In addition, the Court concludes that Dominic's judgment recorded on November 20, 1979 against Carmen's Milford, Connecticut real estate was a preferential transfer avoidable under § 547(b) of the Code. Dominic was a creditor seeking satisfaction of an antecedent debt embodied in his Maryland judgment. The transfer was made within 90 days of the filing of the bankruptcy petition on January 2, 1980—a period during which for the purposes of § 547 the Debtor is presumed to be insolvent. 11 U.S.C. § 547(f) (Supp.IV 1980). The Court found as a fact that Dominic's lien would enable him to receive more than he would have received upon Chapter 7 liquidation. Thus, all the elements of a § 547(b) preference are present, and Dominic's lien should be avoided as a preferential transfer.

Carmen's position that as a Chapter 13 Debtor she may obtain relief under § 547 is without merit. Section 547 is by its express terms a power granted to a "Trustee." Congress chose to vest exclusively in the Chapter 13 Debtor certain powers of a Trustee under § 363. 11 U.S.C. § 1303 (Supp.IV 1980). No other provision of Chapter 13 either expressly or impliedly vests powers of a trustee in the Debtor. Accordingly, aside from the Debtor's avoidance powers otherwise provided for, a Chapter 13 Debtor has no standing to exercise the avoidance powers of a Trustee. *Cf.* 11 U.S.C. §§ 522(f), (g) & (h) (Supp.IV 1980). *See In re Cox,* 10 B.R. 268 (Bkrtcy., D.Md.1981).

4. Dominic's Claim For Punitive Damages.

Dominic's assertion that he is entitled to an award of punitive damages is without merit. The civil conspiracy count in Dominic's counterclaim was dismissed, and none of the evidence or the Court's findings support the conclusion that the conduct of the counter-defendants was outrageous so as to amount to willful or wanton disregard for the rights of others. Moreover, the only Maryland decision, of which the Court is aware, that supports the award of an *in personam* judgment for damages under the Maryland Uniform Fraudulent Conveyances Act is *Damazo v. Wahby,* 269 Md. 252, 305 A.2d 138 (1973). *Damazo,* an opinion subsequent to *Damazo v. Wahby,* 259 Md. 627, 270 A.2d 814 (1970), relied upon by Dominic, stands for no more than the proposition that § 15–209 does not preclude a judgment for damages against the transferee when the property can no longer be recovered from the transferee. Thus, the Court concludes that an award of punitive damages is inappropriate in this case.

5. Dominic's Claim For Costs and Attorney's Fees As a Priority Administrative Expense.

Dominic asserted in the alternative that to the extent that his efforts have avoided Union Home's second mortgage for the benefit of the estate, he is entitled to allowance of an administrative expense claim for costs and attorney's fees under subsections (1) and (3) of § 503(b) of the Code. Whatever the merits of that claim, its assertion in the context of this adversary proceeding is improper. Such an allowance can only occur after "notice and a hearing" affording all creditors and interested parties to make such objections as they may have. *See* 11 U.S.C. § 102 (Supp.IV 1980). Accordingly, the Court, without prejudice to Dominic's right to move for such an allowance at a later time, concludes that no allowance under § 503 is appropriate.

SEPARATE ORDER TO FOLLOW.