997 A.2d 104

Harriette JULIAN

v.

Joseph BUONASSISSI, et al.

No. 37, Sept. Term, 2009.

Court of Appeals of Maryland.

June 16, 2010.

642

644

Phillip Robinson (Civil Justice, Inc., Baltimore), on brief, for petitioner/cross-respondent.

C. Matthew Hill (Public Justice Center, Baltimore; Stephen D. Ball, Mitchellville), on brief, for petitioner/cross-respondent.

Kathleen S. Skullney, Foreclosure Legal Assistance Project Attorney, Legal Aid Bureau, Inc., brief and appendix as Amicus Curiae, for petitioner/cross-respondent.

Scott C. Borison, Legg Law Firm, LLC, Frederick, Michael Gregg Morin, The Holland Law Firm, PC, Annapolis, Amici Curiae Brief of Community Law Center, Maryland Cash Campaign, Maryland Consumer Rights Coalition, and St. Ambrose Housing Aid Center, for petitioner/cross-respondent.

Douglas F. Gansler, Atty. Gen. of Maryland, William D. Gruhn, Jonathan R. Krasnoff, Christopher J. Young, Asst. Attys. Gen., Brief of Amici Curiae the Consumer Protection Division of the Office of the Attorney General and the Commissioner of Financial Regulation, for petitioner/cross-respondent.

F. Robert Troll, Jr., Susan Zuhowski, O'Malley, Miles, Nylen & Gilmore, P.A., brief of Amicus Curiae The Maryland Land Title Association, for respondents/cross-petitioners.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

In this case we have been asked to determine whether a real estate conveyance was void *ab initio* or voidable under the Protection of Homeowners in Foreclosure Act, Sections 7–301 to 7–321 of the Real Property Article, Maryland Code (1974, 2003 Repl. Vol., 2006 Supp.). Although Harriette Julian, the Petitioner and alleged foreclosure rescue scam victim, failed to file a supersedeas bond[1] to stay the ratification by the Circuit Court for Charles County of a foreclosure sale of a property in which she had been in the chain of title, her appeal is not moot. In reaching the merits of her appeal, we hold

---

1. A "supersedeas bond" is defined as "[a]n appellant's bond to stay execution on a judgment during the pendency of the appeal." Black's Law Dictionary 202 (9th ed. 2009). "Supersedeas" is defined as "[a] writ or bond that suspends a judgment creditor's power to levy execution, usu[ally] pending appeal." Black's Law Dictionary 1576 (9th ed. 2009).

that her conveyance in that chain of title would be voidable if the proof adduced during a hearing on her exceptions warranted that action, and that the Circuit Court erred in overruling her exceptions to the foreclosure sale during an earlier hearing.

**Facts and Procedural History**

When facing foreclosure of her Waldorf, Charles County, Maryland, home as a result of her delinquency on a mortgage with AMC Mortgage Services, Inc., Harriette Julian became embroiled in an alleged foreclosure rescue scam perpetrated by Metropolitan Money Store, whereby she conveyed the property in fee simple to a LaShawn Wilson, who procured from Wells Fargo Bank, N.A., an Adjustable Rate Mortgage in the amount of $482,000, which was secured by a Purchase Money Deed of Trust on the home.

At settlement, Ms. Julian signed numerous documents, including a HUD–1 listing her as the Seller and Ms. Wilson as the Buyer, a "Fee Sheet" outlining the disbursements under the "Foreclosure Reversal Program," as well as a document granting a Power of Attorney to Fordham & Fordham Investment Group in order to complete the sale, but also to allegedly open a mortgage escrow account in her name. According to the Power of Attorney and the Fee Sheet, Fordham & Fordham was to place the equity from the sale of the property into a mortgage account from which Wells Fargo would be paid monthly for the mortgage in the amount of $4,201.66 per month for twelve months. At the bottom of the "Fee Sheet" signed by Ms. Julian, the document did not provide notice of Ms. Julian's right to rescind, and in fact, provided notice that she could *not* rescind the transaction:

BY SIGNING THIS STATEMENT YOU ARE STATEING [sic] YOU UNDERSTAND THE ABOVE STATEMENT AS IT READS AND YOU ALSO UNDERSTAND THAT YOU CAN NOT RESEND [sic] THIS LOAN AFTER TODAY DECEMBER 18 2006[.]

According to the HUD–1, Ms. Julian not only received $81,650.87 at the settlement table, but she was relieved of her

obligation under her original mortgage with AMC in the amount of $379,948.92; the Fee Sheet contradicted the HUD–1, and listed a $95,628.87 disbursement to Ms. Julian, with $50,419.92 being placed in escrow, $20,134.17 being applied to closing costs, $10,000 being paid to Fordham & Fordham, $10,000 being paid to an "Investor," and $5,074.78 being paid to Ms. Julian. Ms. Julian believed the "Investor" was Ms. Wilson, the putative purchaser of the property.

Approximately one month after settlement, Wells Fargo assigned the loan to U.S. Bank, as trustee for Citigroup Trust, but Wells Fargo continued to service the loan. Approximately six months after settlement, in June of 2007, the Deed of Trust was recorded among the land records of Charles County.

No payments were ever made on the Note, and Wells Fargo, as servicer of the loan, directed the substitute trustees, Joseph V. Buonassissi, II, Richard E. Henning, Jr., Richard A. Lash, Keith M. Yacko, and Brian S. McNair, to pursue a foreclosure action against the Waldorf property and Ms. Wilson under the name of the current note holder, U.S. Bank, which was done on August 27, 2007, in the Circuit Court for Charles County, as *Joseph Buonassissi, et al. v. LaShawn Wilson*.[2] On the same day, Ms. Julian filed with the Clerk of the Circuit Court for recording among the land records of Charles County a "Notice of Revocation of Power of Attorney and Rescission and Cancellation of Foreclosure Consultant Contract and Foreclosure Reconveyance Deed" ("Notice of Rescission"), putatively under the Protection of Homeowners in Foreclosure Act, Sections 7–301 to 7–321 of the Real Property Article, Maryland Code (1974, 2003 Repl. Vol., 2006

---

2. As part of the foreclosure action, U.S. Bank filed on August 27, 2007, an Order to Docket, a certified copy of the Deed of Trust, a Deed of Appointment of Substitute Trustees appointing Joseph V. Buonassissi, II, et al, as substitute trustees, "with full power and authority to execute all powers and duties vested in the Trustee under the provisions of the Deed of Trust . . . .," a Statement Under Oath as to Mortgage Debt and Military Affidavit, a certified copy of the Adjustable Rate/Balloon Note, and a Motion and Application to Authorize Substitute Trustees to Proceed with Decreased Bond.

Supp.) (PHIFA).[3] Ms. Julian's Notice of Rescission recited
that Ms. Wilson was a "foreclosure consultant" and/or "fore-
closure purchaser," the property was a "residence in foreclo-
sure," the Deed of Trust was a "foreclosure reconveyance,"
and because Ms. Wilson failed to provide the disclosures and
notices required by PHIFA, Ms. Julian had the absolute right
to rescind or cancel any foreclosure reconveyance for a period
of three business days after Ms. Wilson had complied with the
disclosure notices required by PHIFA. Ms. Julian alleged
that because of the failure of notice required by PHIFA, she
had the right to revoke, rescind, and cancel all documents she
had signed, including any powers of attorney, all foreclosure
consulting contracts, and the Deed of Trust or any reconvey-
ance by Ms. Julian to Ms. Wilson or her agents, successors, or
assigns.

The substitute trustees, however, did not discover, and
could not have discovered, the Notice of Rescission when they
performed a title search at the beginning of August. They
did, however, publish notice of the public sale, and mail a
letter to Ms. Julian's home, addressed to "Tenant(s)" which
stated:

> It is my understanding that you may have an interest in the
> Trustee's sale of the above-referenced property. I enclose
> herewith a copy of the notice of a Trustee's sale concerning
> the property.

Thereafter, the Trustees did discover Ms. Julian's Notice of
Rescission during a final title search, days before the public
sale to be held on September 20, 2007. At the sale, the

---

3. The Protection of Homeowners in Foreclosure Act, Sections 7–301 to
7–321 of the Real Property Article, Maryland Code (1974, 2003 Repl.
Vol., 2006 Supp.) (PHIFA), was repealed in 2008, reenacted by Chap-
ters 5 and 6 of the Maryland Laws of 2008, and recodified in Sections
7–301 to 7–325 of the Real Property Article, Maryland Code (1974,
2003 Repl. Vol., 2009 Supp.). The transaction at issue took place after
PHIFA was enacted in 2005, but prior to the 2008 revisions, so that all
references to the Act here are to the version in effect at the time of the
transaction.

substitute trustees, on behalf of U.S. Bank, purchased the property for $480,000.[4]

A notice that the sale of the property would be ratified and confirmed, unless cause to the contrary was shown, was issued by the Circuit Court, and Ms. Julian filed a Motion to Intervene, which was granted by a Circuit Court judge. Ms. Julian then filed Exceptions to the Sale in which she alleged that because the "agents" of Wells Fargo and U.S. Bank perpetrated the scheme to illegally acquire Ms. Julian's property, the sale must be set aside based upon the following:

> Because of the scheme perpetrated by the agents of the Plaintiffs (*i.e.*, Tomlin, Regional Title and Escrow, and the Metropolitan Money Store) in helping Defendant Wilson to illegally acquire the Property from Ms. Julian's equity and interests in the Property, the Plaintiff banks cannot now come before this Court seeking its aid. The Court of Appeals has said unequivocally that this Court cannot help lenders with unclean hands and in this case, because of the acts of its agents in the transactions, the Plaintiffs cannot claim clean hands.

Ms. Julian then claimed that the Deed of Trust was void *ab initio* because it was obtained in violation of PHIFA:

> In the present case, it is clear that Defendant Wilson and her affiliates and agents (who also acted on behalf of the Plaintiffs) acted as both a Foreclosure Consultant and Foreclosure Purchaser under PHIFA. Defendant Wilson is clearly a foreclosure purchaser, as [s]he obtained title to Ms. Julian'[s] home while that home was in foreclosure, as the result of a reconveyance.

\* \* \*

---

**4.** The substitute trustees filed an "Affidavit of Notice in Compliance with Real Property Article Sections 7–105 and 14–126 and Rule 14–206(b)," an "Affidavit of Purchaser," by which Crystal Elkins acted "as agent for U.S. Bank National Association, as Trustee for CMLTI 2007–WFHE2, the principal who purchased the property which is subject matter of this proceeding for the sum of $480,000.00 at the Trustee's Sale . . . .," and a "Report of Sale and Affidavit of Fairness of Sale and Truth of Report of Sale."

Defendant Wilson obtained an *illegal interest in* Ms. Julian's property that clearly violates the public policy of this state.

\* \* \*

Here, Ms. Julian properly rescinded her transfer of title to Defendant Wilson on August 27, 2007. The rescission document was then recorded in the land records of Charles County, Maryland. This document clearly sets forth that the transaction being rescinded falls under PHIFA. Upon this rescission, title to the Property was in the name of Ms. Julian, and the deed to Defendant Wilson was rendered void *ab initio.*

(Alterations added and citations omitted). She further alleged that Wells Fargo and U.S. Bank had been on "inquiry notice" that a foreclosure scam was being effectuated so that the sale to Ms. Wilson was not *bona fide:*

[Wells Fargo's] agents were also affiliates or agents of Defendant Wilson in the foreclosure scheme. [Wells Fargo was] therefore on notice of the foreclosure rescue scheme when it extended the mortgages to Defendant Wilson, making it clearly non-bona fide. Therefore, it could not transfer an interest to [U.S. Bank] here which was greater than it had, and which was subject to rescission by Ms. Julian.

[Wells Fargo was] also on notice due to the foreclosure proceeding that had been docketed against the Property, due to a lease agreement [5] for Ms. Julian to remain in the Property post-sale, and due to other facts. [Wells Fargo's] settlement agent, whose knowledge is imputed to [U.S. Bank], also had knowledge of various irregularities in the transaction that, at the very least, put it on notice and required investigation.

\* \* \*

Moreover, Ms. Julian had a *lis pendens* on the Property beginning from the filing of the original class action lawsuit

---

5. There is no lease agreement in the record as it was not admitted into evidence at the Exceptions Hearing.

in the Circuit Court [for] Prince George's County and the current suit pending in federal court.

(Alterations and footnote added).[6] She then claimed that because she was neither joined as a required party to the foreclosure action nor "properly" notified of the foreclosure action, the suit must be dismissed because the foreclosure sale was improper and irregular:

> [T]he disposition of this action would most certainly "impair or impede" Ms. Julian'[s] claimed interest in the Property, which is the only subject of this action. Ms. Julian recorded a rescission of any transfer of her deed, filed a lawsuit on the subject, among other things, to occupy the Property and retain possession.
>
> * * *
>
> Ms. Julian is the record owner of the Property, and therefore, should have been timely and appropriately notified of these proceedings and she was not. Ms. Julian rescinded any transfer of the deed to the Property under the PHIFA statute and recorded that rescission.

She finally argued that as a result of U.S. Bank's failure to join or notify her of the foreclosure sale, her due process rights were violated, and she did not have an opportunity to exercise her right of redemption before the sale:

> Ms. Julian did not have an opportunity to defend [her] home from being foreclosed upon and sold at auction. Ms.

---

6. At the time Ms. Julian's exceptions were filed, a class action lawsuit had been filed in the U.S. District Court for the District of Maryland by three named homeowners on behalf of themselves and a class of others similarly situated against fourteen named defendants, alleging violations of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), the Federal Real Estate Settlement Procedures Act (RESPA), and the Maryland Protection of Homeowners in Foreclosure (PHIFA). *Proctor, et al. v. Metropolitan Money Store, et al.*, Case No. 8:07–cv–01957–RWT (July 24, 2007). Ms. Julian was not a named plaintiff and Ms. Wilson was not a named defendant. The original class complaint was filed in June of 2007 in the Circuit Court for Prince George's County as Case No. CAL07–15383, but was voluntarily dismissed and re-filed in the U.S. District Court.

Julian had no knowledge of the foreclosure sale details until after the sale occurred.

(Alterations added).

The substitute trustees filed an opposition claiming that Ms. Julian's claims were insufficient to meet her burden of proof. They alleged there were no defects in the manner of sale of the property, and arguments to the contrary were merely "academic," because Ms. Julian received notice of the sale:

> Because [Ms. Julian] alleges that she occupied the Property per an under-the-table "sale-leaseback" transaction, by her own admission, she could not escape receiving notice directed to the property. [The substitute trustees] gave notice addressed not only to [Ms. Wilson], but to the Property, and if, as alleged, [Ms. Julian] occupied the Property, then she received notice. [The substitute trustees] sent notice by both certified mail and first class mail. Although the certified letters were unclaimed despite being left at the premises, the sending, and even delivery, of the regular mail notices is presumed.

(Alterations added and citations omitted). The substitute trustees claimed that Ms. Julian lacked standing to raise exceptions, but even if she had standing, her exceptions were limited to those addressing alleged defects in the manner of the sale, and "[o]ther than the fabricated claim of lack of notice, [she] has not presented any valid exceptions, and therefore the sale must be ratified." The substitute trustees then argued that if the sale were not ratified, Ms. Julian must file a bond:

> A bond is necessary because Wells Fargo lent $482,000 of the purchase money for Defendant Wilson to acquire the Property, of which $379,948.92 was used to pay off [Ms. Julian's] prior deed of trust, and $81,650.87 was reported as paid to [Ms. Julian] on the HUD–1 she signed. Thus, while Wells Fargo has ongoing losses due to its loan not being paid, [Ms. Julian]—by her own allegations—continues to occupy the property for free. [Ms. Julian] is not paying Wells Fargo's mortgage; she is not making any payments

on the prior deed of trust that was paid off at settlement using funds originating from Wells Fargo. Nor is [Ms. Julian] paying rent under the alleged "sale-leaseback."

(Alterations added). The substitute trustees further alleged that Ms. Julian's Notice of Rescission did not affect Wells Fargo's rights under the previously recorded Deed of Trust, because her "rescission is not alleged to have been given prior to the Defendant Wilson's conveyance of the Deed of Trust." Furthermore, they argued that there was no *lis pendens* because the "lawsuit was initiated after Wells Fargo loaned funds to Defendant Wilson and obtained its interest under the Deed of Trust. In any event, a class action lawsuit that does not name the lender or trustee as a party to the lawsuit cannot serve as the basis of a *lis pendens.*"

The substitute trustees then turned to PHIFA and claimed that because its provisions "do not apply to a national bank, such as Wells Fargo," that it "cannot serve as the basis to invalidate its interest in the deed of trust on the subject property." The substitute trustees next contended that even if they were subject to PHIFA, Ms. Julian "[was] not entitled to rescind the transaction because she [had] not returned the purchase money and accrued interest," and then claimed that her failure to perfect her rescission by failing to return the money together with 8% interest within sixty days, resulted in a waiver.

They also subsequently argued that Wells Fargo was a *bona fide* lender for value, U.S. Bank was a *bona fide* assignee for value, and Ms. Julian did not allege "any facts suggesting that Wells Fargo [had] actual knowledge":

There are no facts alleged suggesting that Wells Fargo is anything but a bona-fide lender for value without notice of any defect in its grantor's title. Had Wells Fargo any knowledge or facts of such nature, it would not have lent $482,000 to Defendant Wilson. Moreover, even if [Ms. Julian's] claims regarding the other parties are true, equity should not allow [Ms. Julian] to now attack Wells Fargo's

interest after she actively participated in deceiving Wells Fargo into making a $482,000 loan to Defendant Wilson.

Additionally, regardless of Wells Fargo's status as a bona-fide lender, [U.S. Bank] itself is a bona fide assignee for value, without notice of the supposed consulting arrangements between [Ms. Julian] and Defendant Wilson, and therefore takes its security interest free from the equities claimed by [Ms. Julian].

(Alterations added). The substitute trustees further alleged that no agency relationship existed, but if it did, it would have been between Metropolitan Money Store and Ms. Wilson and/or Ms. Julian, and not Wells Fargo:

Wells Fargo's dealings were limited to providing a loan to Defendant Wilson. Wells Fargo had no interaction with [Ms. Julian] and had no need for any interaction with [Ms. Julian].

Moreover, Metropolitan Money Store ("MMS") has no exclusive relationship with Wells Fargo and worked on behalf of Defendant Wilson to find her a loan, and could at most be an agent or independent contractor of Defendant Wilson. Interestingly, to the extent that [Ms. Julian] claims that she too engaged MM S to avoid foreclosure under her prior deed of trust, MMS may even be her agent.

\* \* \*

Here, neither MMS, [Regional Title and Escrow ("RTE")], nor any other party was subject to Wells Fargo's right of control, or had the requisite power or duty. Neither MMS or RTE had any power or authority to alter the terms of the loan between Wells Fargo and Defendant Wilson.

(Alterations added and citations omitted). Furthermore, the substitute trustees argued that Regional Title and Escrow acted as an escrow, not an agent of any party, but even if there were an agency relationship, the adverse actions of Metropolitan Money Store and Regional Title and Escrow could not be imputed to Wells Fargo:

[B]ecause the alleged interests of MMS and RTE in the alleged "under-the-table" deal would be directly adverse to Wells Fargo's interest, knowledge of the "under-the-table" deal cannot be attributed to Wells Fargo—even if they were an agent. Nor would such transaction be within the scope of the alleged agency.... Wells Fargo would not knowingly expose itself to a \$482,000 loan if it knew of any impropriety in the deal.

\* \* \*

[Ms. Julian's] allegations rely on MMS and RTE deceiving Wells Fargo into making a loan. [Ms. Julian's] allegation that RTE Title falsely prepared the HUD–1 statement relies on RTE deceiving the lender to cover-up the "under-the-table" dealings—dealings which [Ms. Julian] is a participant—and deceiving Wells Fargo into loaning \$482,000.... No respectable lender, such as Wells Fargo, would make a loan knowing that their security interest was in dispute or doubt.

(Alterations added and citations omitted). The substitute trustees also argued that Ms. Julian's allegations of equity stripping and an "under-the-table" transaction did not involve Wells Fargo, because "even if ... the 'over-the-table' documents were inaccurate, those documents were relied upon by Wells Fargo in lending the \$482,000, and Wells Fargo was statutorily required to deliver the settlement funds to the parties' closing agent...." Moreover, the substitute trustees claimed that the mortgage could not be invalidated because Wells Fargo was not a party to any fraud, and "even if [Ms. Wilson] obtained title through fraudulent conduct, Maryland law recognizes the validity of an instrument given to a lender." (Alterations added). Finally, they contended that the class action lawsuit filed in federal district court against Metropolitan Money Store and others, did not include Wells Fargo or any other lender as a defendant, and Ms. Julian's counsel "truly know[s] that they have no claim against Wells Fargo...."

A hearing on the exceptions to the ratification of the sale was held in the Circuit Court for Charles County in January of 2008, during which Ms. Julian testified. She explained that several months after the closing on her home, she received a note placed inside the storm door of her home from Wells Fargo, but when she contacted the Bank, no one would speak with her because only Ms. Wilson's name was on the Promissory Note. Ms. Julian testified that she contacted Ms. Wilson, and in March of 2007, together proceeded to place a telephone call to Wells Fargo, during which they were informed that payments were not being made on the Note. Allegedly, as a result of the telephone call, Ms. Wilson received and completed a "fraud packet" and "ID Theft Affidavit" forwarded same to Wells Fargo, but no proof of receipt or acknowledgment from Wells Fargo was evidenced. Ms. Julian testified that she and Ms. Wilson also had another conference call with Wells Fargo to figure out "some kind of payment arrangements," but no arrangements were forthcoming, because Ms. Wilson did not have sufficient financial income.

Ms. Julian's next witness, David Schickner, an investigator from the Maryland Department of Labor, Licensing and Regulation, testified that he spoke to Ms. Julian during the course of an investigation of Metropolitan Money Store, but that he did not have personal knowledge of any relationship—collusive or otherwise—between Wells Fargo and Regional Title and Escrow, the settlement agent. Ms. Julian's final witness, Brian Terlinsky, an attorney from the trustees' law firm, Buonassissi, Henning & Lash, testified that his office received the foreclosure matter from the servicer of Ms. Wilson's loan, Wells Fargo, who directed the substitute trustees to pursue foreclosure against the Waldorf property and Ms. Wilson under the name of the current noteholder, U.S. Bank. Mr. Terlinsky testified that LaShawn Wilson was the only name listed on the Note, and that his firm did not review the transaction between Ms. Wilson and Ms. Julian. He finally explained that in anticipation of the sale, an initial title search on the property was performed at the beginning of August 2007, and did not find Ms. Julian's Notice of Rescission,

because it was recorded weeks later on August 27, 2007. He acknowledged that the Notice of Rescission did turn up in a final title search right before the public sale on September 20, 2007, but another notice to Ms. Julian was not given as a result of the discovery because Ms. Julian's Notice was found among the land records within thirty days of the sale.[7]

The substitute trustees moved for a directed verdict at the close of Ms. Julian's case and the trial judge, in granting the directed verdict, reflected that Ms. Julian was "scammed," but that she did not make a prima facie showing that Wells Fargo was complicit in a fraudulent foreclosure rescue scheme or that there was an agency relationship between Wells Fargo and the perpetrators of the fraud:

Because in this situation I have not heard evidence that satisfies me even to the point of being able to say well, they made a prima facie showing that the lender itself, Wells Fargo, had an employee who was complicit in the fraud ... we have other people down the line who are assignees for value of whatever they had who were without notice who have some rights in this, too. It's because lenders and ... investors make up the market and make it possible for even

---

7. Mr. Terlinsky was, presumably, referring to Section 7–105(c) of the Real Property Article (1974, 2003 Repl. Vol., 2006 Supp.), which requires that notice of the sale be given to a "holder of a subordinate interest" in the property, unless the recording of the subordinate interest is filed within thirty days of the foreclosure sale:

(5) The person authorized to make a sale in an action to foreclose a mortgage or deed of trust is not required to give notice to the holder of a subordinate mortgage, deed of trust, or other subordinate interest if:

(i) The existence of the mortgage, deed of trust, or other subordinate interest is not reasonably ascertainable;

(ii) The identity or address of the holder of the mortgage, deed of trust, or other subordinate interest is not reasonably ascertainable;

(iii) With respect to a recorded or filed subordinate mortgage, deed of trust, or other recorded or filed subordinate interest, the recordation or filing occurred after the later of:

1. 30 days before the day on which the foreclosure sale was actually held; and

2. The date the action to foreclose the mortgage or deed of trust was filed. . . .

people who can afford it to buy houses ... who can afford to make the payments to buy houses, that a statutory scheme aimed at providing a remedy for specific misconduct on the part of unscrupulous people has to have what I'll call a saving clause to protect people who are again put in ... not putting good money after bad, but putting good money into a situation where they would be not protected but for a saving clause such as section 7–311, or whatever it is ... 7–311(e).

The judge noted that after resolving all inferences in favor of Ms. Julian, who he characterized as a victim, no evidence had been presented that either Ms. Wilson, Wells Fargo, or U.S. Bank could be charged with "notice or knowledge of the malfeasance" of the mortgage broker, Metropolitan Money Store. The court ratified the trustees' report of the foreclosure sale and ordered the matter to be referred to the Court Auditor for the "Statement of an Audit." Ms. Julian appealed to the Court of Special Appeals (*Julian I*), but did not request a stay of the Circuit Court Ratification Order or file a supersedeas bond as required by Rules 8–422[8] and 8–423.[9] The substitute trustees filed a "Motion to Require a Supersedeas Bond or Strike the Appeal"; another judge, without a hearing, ordered a supersedeas bond of $430,000 or "such amount sufficient to secure that amount pursuant to Maryland Rule 8–423(b)(2)," in order to facilitate any stay of the Order ratifying the sale.[10] Ms. Julian failed to file the bond, and appealed the

---

**8.** Rule 8–422(a)(1) provides that when a judgment is rendered against a party, the appellant "may stay the enforcement of any other civil judgment from which an appeal is taken by filing with the clerk of the lower court a supersedeas bond under Rule 8–423."

**9.** Rule 8–423(b)(2) provides in relevant part:

When the judgment determines the disposition of the property in controversy (as in real actions, replevin, and actions to foreclose mortgages,) or when the property, or the proceeds of its sale, is in the custody of the lower court or the sheriff, the amount of the bond shall be the sum that will secure the amount recovered for the use and detention of the property, interest, costs, and damages for delay.

**10.** The order for a supersedeas bond provided:

supersedeas bond order as well (*Julian II* ). The Court of Special Appeals affirmed the Circuit Court in *Julian I*, but declined to address the bond issue, which was then pending in that Court, because it had not been briefed. The intermediate appellate court held that violations of PHIFA rendered the deed voidable and not void *ab initio*. The Court also held that U.S. Bank enjoyed the same protection as a *bona fide* purchaser, because Ms. Julian failed to produce any evidence that Metropolitan Money Store, Regional Title and Escrow, or Ms. Wilson were agents of Wells Fargo and/or U.S. Bank or that Wells Fargo or U.S. Bank had sufficient notice to inquire into whether the transaction between Ms. Julian and Ms. Wilson was *bona fide*. We granted certiorari in *Julian I*, *Julian v. Buonassissi*, 408 Md. 487, 970 A.2d 892 (2009), to consider the following questions:

1) Did the Court of Special Appeals err in determining that an express violation of a broad remedial statute rendered the underlying transaction merely voidable and not void *ab initio?*

2) In the alternative, if the transaction is voidable, did the circuit court and the Court of Special Appeals err in failing to hold that the Petitioner adduced sufficient evidence that the Respondents were on notice of the foreclosure consulting contract and thereby shift the burden to the Respondents to prove bona fides? [11]

---

Upon consideration of PLAINTIFFS' MOTION FOR A SUPERSEDEAS BOND OR STRIKE THE APPEAL, and any opposition or response thereto, it is, therefore, this 16th day of September, 2008,

ORDERED that, as a condition for the continued prosecution of this appeal, Intervenor/Appellant shall provide a bond in the amount of $430,000 or such amount sufficient to secure that amount pursuant to Maryland Rule 8–423(b)(2), and that the Clerk of this Court shall accept such bond.

11. We adopt the Court of Special Appeals' reasoning regarding inquiry notice and do not address this question, because we conclude that mere knowledge of an unconsummated foreclosure, followed by a conveyance of the property to a third party by the homeowner facing foreclosure, is not adequate to put a lender involved in the sale or an assignee of the lender on inquiry notice of a possible foreclosure scam transac-

We also granted certiorari to ponder the question presented in the cross-petition of *Julian I:*

> 3) Where a party seeks rescission, or seeks to void a transaction under circumstances where they would have to return funds received, whether the trial court abused its discretion in requiring as a condition of the continued prosecution of an appeal, that such party post a bond commensurate with the undisputed amounts they received (or an amount sufficient to secure the undisputed amount received)?

We then ordered a writ of certiorari, on our own motion, to consolidate *Julian I* and *Julian II, Julian v. Buonassissi,* 409 Md. 44, 972 A.2d 859 (2009), because *Julian II* dealt with the same issue raised in the cross-petition.

**Discussion**

█ As a threshold issue, we must determine whether the failure to post a supersedeas bond pursuant to Rules 8–422(a)(1) and 8–423(b)(2) deprives Ms. Julian of her appellate opportunity, because its absence could warrant depriving her of the stay of the foreclosure sale, rendering her appeal nugatory. In *Mirjafari v. Cohn,* 412 Md. 475, 483–84, 988 A.2d 997, 1002 (2010), Judge Harrell, writing on behalf of the Court, recently and cogently described how the absence of a supersedeas bond staying the judgment of a trial court order ratifying a foreclosure sale may moot an appeal:

> In *Baltrotsky v. Kugler,* 395 Md. 468, 910 A.2d 1089 (2006), we noted that "Maryland decisional law speaks clearly on the question of the mootness of appellate challenges to ratified foreclosure sales in the absence of a *supersedeas* bond to stay the judgment of a trial court." *Id.* at 474, 910 A.2d at 1093. The general rule is that "the rights of a *bona fide* purchaser of mortgaged property would not be affected by a reversal of the order of ratification in the absence of a bond having been filed." [9] *Id.; Pizza v. Walter,* 345 Md. 664, 674, 694 A.2d 93, 97 (1997), mandate withdrawn, 346

---

tion, such that the lender/assignee should act as a private Attorney General investigating consumer complaints.

Md. 315, 697 A.2d 82 (1997) (withdrawing by joint motion pursuant to settlement agreement); *Lowe v. Lowe*, 219 Md. 365, 368, 149 A.2d 382, 384 (1959); *see also Leisure Campground & Country Club Ltd. P'ship v. Leisure Estates*, 280 Md. 220, 223, 372 A.2d 595, 598 (1977). As a consequence, "an appeal becomes moot if the property is sold to a bona fide purchaser in the absence of a supersedeas bond because a reversal on appeal would have no effect." *Baltrotsky*, 395 Md. at 474, 910 A.2d at 1093; *Pizza*, 345 Md. at 674, 694 A.2d at 97; *see also Lowe*, 219 Md. at 369, 149 A.2d at 384–85. The rule operates "even though the purchaser may know that a claim is being asserted against ratification." *Leisure Campground*, 280 Md. at 223, 372 A.2d at 598; *see also City of Hagerstown v. Long Meadow Shopping Center*, 264 Md. 481, 497, 287 A.2d 242, 250 (1972).

9. A *bona fide* purchaser, in the case of a foreclosure sale, "is a purchaser who takes the property without notice of defects in the foreclosure sale." *Baltrotsky*, 395 Md. at 474–75, 910 A.2d at 1093; *see also Pizza*, 345 Md. at 674, 694 A.2d at 98.

The rule is intended to encourage non-party individuals or entities to bid on foreclosure sale properties, as bidders "justifiably would be reluctant to purchase a foreclosure property without assurance in the form of some security that their investments will be protected from subsequent litigation by recalcitrant mortgagors seeking to retain their property." *Baltrotsky*, 395 Md. at 475, 910 A.2d at 1094; *see also Leisure Campground*, 280 Md. at 223, 372 A.2d at 598. Likewise, the rule protects lenders who have succeeded in foreclosure but who, without operation of the rule, "could not enjoy [their] success until the new action was fully litigated, all the while bearing the lost interest income." *Baltrotsky*, 395 Md. at 476, 910 A.2d at 1094. Thus, "[t]he law is clear that [mortgagors] may not litigate the validity of the foreclosure at the expense of others; the posting of security is required on [the mortgagor's] part to protect the purchasers and lenders alike." *Id.*

(Alterations and footnote in original).

■ The two exceptions to the supersedeas bond requirement are 1) when a mortgagee or its affiliate purchases the

disputed property at the foreclosure sale, and 2) the occasion of unfairness or collusion between the purchaser and the trustee. *Baltrotsky*, 395 Md. at 475, 910 A.2d at 1093; *Pizza*, 345 Md. at 674, 694 A.2d at 98; *Leisure Campground*, 280 Md. at 223, 372 A.2d at 598.

The first exception exists because " 'a mortgagee who buys at a foreclosure sale does not free himself from the underlying dispute to which he is a party, and with the land in his hands, there is no reason why he should not be bound by a decision of the court requiring delivery of the property.' " *Pizza*, 345 Md. at 674, 694 A.2d at 98, quoting *Leisure Campground*, 280 Md. at 223, 372 A.2d at 598. Thereby, the mortgagee who purchases at its own sale does not have the status of a *bona fide* purchaser, whose liabilities upon purchase require the filing of a supersedeas bond.

In *Leisure Campground & Country Club Ltd. Partnership v. Leisure Estates*, 280 Md. 220, 223, 372 A.2d 595, 598 (1977), we relied on *Silver v. Benson*, 227 Md. 553, 177 A.2d 898 (1962), to formulate the mortgagee buy-in exception to the supersedeas bond requirement, and held that a mortgagee who buys in at a foreclosure sale does not have the status of a *bona fide* purchaser. This exception was based upon the assumption that a *bona fide* mortgagee is involved in the underlying proceedings and "still in court and amenable to court orders," thereby binding the mortgagee to a decision of the court requiring delivery of the property. *Silver*, 227 Md. at 559, 177 A.2d at 901.

■ We have yet to address, in reality, whether the assignee [12] of an original mortgagee who buys at a foreclosure sale has the status of a *bona fide* purchaser who deserves the protection of a supersedeas bond, or that of a mortgagee who

---

**12.** An assignment is a transfer of property or of some other right from one person (the assignor) to another (the assignee), which confers a complete and present right in the subject matter to the assignee, and privity of estate between the original parties ceases to exist. *See La Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194, 211, 958 A.2d 269, 279 (2008); *Italian Fisherman, Inc. v. Middlemas*, 313 Md. 156, 163, 545 A.2d 1, 4 (1988).

buys at its own foreclosure sale, who under the exception articulated in *Leisure Campground*, does not. It is clear, however, that U.S. Bank, by its nature as the foreclosing party that purchased the property at the foreclosure sale was "still in court and amenable to court orders," whether or not it was an assignee or the original mortgagee.

U.S. Bank, nevertheless, asserts that as a *bona fide* assignee, it is entitled to protection as a *bona fide* purchaser, conflating purchase with assignment. Ms. Julian, conversely, claims that her Notice of Rescission deprives U.S. Bank of its favored status as a *bona fide* assignee for value without notice because that notice was filed three weeks prior to the foreclosure sale and months after the assignment to U.S. Bank occurred.

In this regard, it is important to our analysis to recognize that U.S. Bank's status as a *bona fide* assignee, however, is distinct and separate from its status as a *bona fide* purchaser. As we explained in *Wilson Brothers v. Cooey*, 251 Md. 350, 247 A.2d 395 (1968), an assignee's status as *bona fide* for value and without notice is not changed by subsequent events; rather, an assignee's status is determined at the time of assignment. *See also People's Banking Co. v. Fidelity & Deposit Co.*, 165 Md. 657, 681, 170 A. 544, 554 (1934). In *Wilson*, Holiday Barn, Inc. (Barn), purchased an unimproved lot and mortgaged the lot by borrowing $110,000 from Colonial Estates, Inc. (Colonial). Consideration was lacking in the Barn–Colonial transaction, but Colonial, nevertheless, assigned the mortgage to Farmers and Mechanics National Bank of Frederick (F and M), which in reliance on the mortgage as well as three other mortgages, and without notice of any defects in the Barn–Colonial transaction, lent money to Colonial. After Colonial defaulted on its loan and Barn defaulted on its mortgage, F and M assigned the Barn's mortgage to Cooey for foreclosure proceedings. The Barn's property was sold at a public sale and the sale was ratified, but after ratification, Maryland National Bank and several parties holding mechanics' liens against the property intervened, claiming proceeds of the foreclosure sale. On appeal, we explained that although

there was no consideration in the transaction between the original mortgagor and the original mortgagee, "once an assignment of a mortgage is made to a *bona fide* purchaser for value without notice, an entirely different set of rules comes into play." *Wilson*, 251 Md. at 356, 247 A.2d at 399. We then expounded on how F and M, as a *bona fide* assignee without notice, was afforded greater protection than the original mortgagee:

> While a case can be postulated where an assignee, because of notice, of insufficient consideration, or of lack of good faith might wholly or partially lose the protection accorded an innocent assignee for value, the lack of diligence exhibited by Farmers and Mechanics, about which the Lienors complain, is not sufficient to tip the scales. Farmers and Mechanics exercised reasonable prudence, and that is enough. **An assignee for value of a mortgage which appears valid on its face, who has no notice of irregularity or reason to suspect it, is chargeable with what appears in the land records but is not to be put to the broader investigative burden customarily shouldered by the mortgagee.**

*Id.* at 358–59, 247 A.2d at 400 (emphasis added). In this regard, and importantly for our purpose, F and M's status as a *bona fide* assignee for value and without notice was determined *at the time* of the assignment.[13] Consequently, we held that although the Barn's mortgage was invalid as to Colonial (the original mortgagee) it was valid as to F and M, the assignee. We also noted that, "[e]ven though the mortgage was gotten without consideration by the mortgagee [Colonial] and could, therefore, be set aside by the mortgagee even in the hands of an assignee, yet if the mortgage gets into the hands of a *bona fide* assignee for value, who has no notice of

---

**13.** In *People's Banking Co. v. Fidelity & Deposit Co.*, 165 Md. 657, 681, 170 A. 544, 554 (1934), we determined the *bona fide* status of an assignee of mortgages at the time of assignment:

> With the information available to it, when it took the assignments, it is impossible to charge Fidelity Company with knowledge of the insolvency of the Trust Company. . . .

lack of consideration, it will be good as against creditors of the mortgagee." *Id.* at 356, 247 A.2d at 399 (alterations added). We further noted that, "[a]n assignee for value of a mortgage which appears valid on its face, who has no notice of irregularity or reason to suspect it, is chargeable with what appears in the land records but is not to be put to the broader investigative burden customarily shouldered by the mortgagee." *Id.* at 359, 247 A.2d at 400.

 Although U.S. Bank may have enjoyed *bona fide* assignee status *at the time it took the assignment,* a *bona fide* purchaser, in the case of a foreclosure sale, " 'is a purchaser who takes the property without notice of defects in the foreclosure sale.' " *Mirjafari,* 412 Md. at 484 n. 9, 988 A.2d at 1002 n. 9, quoting *Baltrotsky,* 395 Md. at 474–75, 910 A.2d at 1093; *see also Pizza,* 345 at 674, 694 A.2d at 98. Thus, in order for U.S. Bank to be protected by the supersedeas bond rubric, U.S. Bank must have enjoyed *bona fide* purchaser status *at the time it purchased the property* at the foreclosure sale, so that it would have had to have no knowledge of any defects in the title or the foreclosure proceedings.

In granting the supersedeas bond, the Circuit Court judge, without a hearing, had to have assumed the *bona fides* of U.S. Bank's status. This was error. Rather, because U.S. Bank, admittedly, had notice of an alleged defect prior to the foreclosure sale, its *bona fide* status at the time of the sale was in question.[14] U.S. Bank, therefore, did not carry its burden to prove entitlement to the supersedeas bond protection, after having filed its motion; as a result, because of the trustees' knowledge of the Notice, under our jurisprudence, most recently explicated in *Mirjafari,* the prerequisite for requiring a bond was not met and Ms. Julian's failure to file a bond does not render her appeal moot. We proceed to the merits of the case.

---

**14.** At oral argument, counsel for U.S. Bank acknowledged that a Notice of Rescission had been filed by Ms. Julian, and was discovered prior to the foreclosure sale, but questioned whether the Notice was a valid document arguing that "a party cannot just file something in the land records and say, 'I'm free.' "

■ Ms. Julian initially argues that the transfer and recording of the deed of trust, as well as Ms. Wilson's failure, as the foreclosure purchaser, to provide notice to Ms. Julian of her rescission rights under PHIFA, were statutory violations rendering their agreement under PHIFA and the Deed of Trust void *ab initio.* In doing so, she relies on a number of cases involving contracts, rather than deeds of trust, for the proposition that violations of PHIFA rendered her deed to Ms. Wilson void from its inception. *See Queen v. Agger,* 287 Md. 342, 346, 412 A.2d 733, 735 (1980); *Downing Dev. Corp. v. Brazelton,* 253 Md. 390, 398–400, 252 A.2d 849, 854 (1969); *Thorpe v. Carte,* 252 Md. 523, 529–30, 250 A.2d 618, 621–22 (1969); *Goldsmith v. Manufacturers' Liab. Ins. Co. of N.J.,* 132 Md. 283, 286, 103 A. 627, 628 (1918); *Webb v. Haeffer,* 53 Md. 187, 190 (1880).

U.S. Bank asserts that, even assuming that Ms. Julian was induced fraudulently to enter into a foreclosure consulting agreement with Metropolitan Money Store and Ms. Wilson, fraudulent inducement renders the instant deed of trust, at most, voidable. U.S. Bank contends that if the Legislature in PHIFA intended to abrogate the common law, it would have done so explicitly.

The distinction between a transaction being deemed void and voidable is clearly an important one. A void contract "is not a contract at all," Restatement (Second) of Contracts § 7 cmt. a (1981), and all parties, present and future, would be equally allowed to avoid the contract. *See United States for the Use of the Trane Co. v. Bond,* 322 Md. 170, 179–80, 586 A.2d 734, 738 (1991); *Monumental Building Ass'n v. Herman,* 33 Md. 128, 132 (1870); *Harding v. Ja Laur Corp.,* 20 Md. App. 209, 214, 315 A.2d 132, 135 (1974) ("A deed obtained through fraud, deceit or trickery is voidable as between the parties thereto, but not as to a *bona fide* purchaser. A forged deed, on the other hand, is void *ab initio.*").

■ A voidable contract, on the other hand, is "one where one or more parties thereto have the power, by a manifestation of election to do so, to avoid the legal relations

created by the contract, or by ratification of the contract to extinguish the power of avoidance." Restatement (Second) of Contracts § 7 (1981); *see Coopersmith v. Isherwood*, 219 Md. 455, 461, 150 A.2d 243, 247 (1959) (adopting Restatement of Contracts § 13 (1932), precursor to § 7). We have long recognized that contracts obtained by fraud are not absolutely void, but are "voidable at the election of the parties affected by the fraud" and "binding until properly avoided." *Urner v. Sollenberger*, 89 Md. 316, 332, 334, 43 A. 810, 811–12 (1899); *see also Iseli v. Clapp*, 254 Md. 664, 669–72, 255 A.2d 315, 318–19 (1969) (holding that a foreclosure rescue scam victim's deed was voidable, but not as against innocent third parties); *Hoffman v. Seth*, 207 Md. 234, 239, 114 A.2d 58, 60 (1955) (stating that an agreement or conveyance procured by a false representation of a material fact is voidable, but not void); *Wicklein v. Kidd*, 149 Md. 412, 424–25, 131 A. 780, 784–85 (1926).[15]

---

**15.** Our jurisprudence is clear that when a competent person signs a contract or disposes of his or her property in the absence of fraud, misrepresentation, mistake, undue influence, or fiduciary relations, the contract will be enforced:

> [P]arties of sound mind and under no legal disabilities, and not occupying fiduciary relations, are left free to make such contracts as to them seem wise. The courts will not reform or rescind such contracts without the consent of the parties, when there is no fraud, misrepresentation, mistake, undue influence, or fiduciary relation shown to exist, or unless the equities are such that they should not be enforced.

*Gardiner v. Gardiner*, 200 Md. 233, 240, 88 A.2d 481, 484 (1952); *Von Buchwaldt v. Schlens*, 123 Md. 405, 91 A. 466 (1914). In *Von Buchwaldt*, we explained that in the context of deeds, when a party does not misapprehend the contents of a deed, there is an absence of fraud and undue influence, and no power of revocation was reserved, the party remains bound to the contract:

> "[E]very person, whether man or woman, of sound and disposing mind, if under no legal disability, has the absolute right of making any disposition of his or her property that he or she may think proper, provided it does not interfere with the existing rights of third persons. If the disposition of property be fairly made by a competent person, though entirely voluntary and without consideration, it is perfectly valid, and cannot be rescinded simply because the Court may think it absurd or improvident that such a disposition should have been made."

*Von Buchwaldt*, 123 Md. at 410–11, 91 A. at 468, quoting *Goodwin v. White*, 59 Md. 503, 509 (1883). In the absence of a confidential

The distinction between a void contract and a voidable one is especially important in situations involving deeds; once a deed is considered void *ab initio* or of no legal effect, there are lasting consequences to everyone in the subsequent chain of title. As a result, we have been circumspect at common law [16] in finding a deed void *ab initio* and have limited our rulings regarding voidness to circumstances that go to the face of the deed, *e.g.,* forgery. *See Maskell v. Hill,* 189 Md. 327, 335, 55 A.2d 842, 845 (1947) (holding that a forged deed is a nullity); *see also Harding,* 20 Md.App. at 214, 315 A.2d at 135 ("A forged deed ... is void *ab initio.*"). In *Harding,* our intermediate appellate court discussed how a forged deed, void from inception, does not protect *bona fide* purchasers:

relationship, such as between parent and child, the grantor of the deed assailing its validity bears the burden of proof. *Id.* at 410, 91 A. at 468. *See also Highberger v. Stiffler,* 21 Md. 338, 352–53 (1864) (holding that contracts and conveyances are voidable and will be set aside, except as to third parties, when a confidential relationship is abused).

**16.** We have held that deeds of bargain and sale made by persons under the age of twenty-one (infants) are voidable and not void. *See Sprecher v. Sprecher,* 206 Md. 108, 113, 110 A.2d 509, 512 (1955) ("A conveyance made by an infant under twenty-one years of age is not void, but is voidable, if disaffirmed within a reasonable time after he or she attains the age of twenty-one years."); *Monumental Building Ass'n v. Herman,* 33 Md. 128, 132 (1870) (holding that when a contract is to the infant's prejudice, it is void, but where it may be for his or her benefit, "it is valid or voidable only at the election of the infant when of age," otherwise, "if it were absolutely void, the adult party contracting with him, would be equally discharged").

We also have held that when a debtor is "in failing or embarrassed circumstances," he has "the right to execute a deed of trust for the benefit of creditors," by dedicating all of his property and estate to the payment of his debts, even when suffering from mental infirmity (lunatics). *See Riley v. Carter,* 76 Md. 581, 595–96, 25 A. 667, 668–69 (1893) (holding that when the deed of bargain and sale of a lunatic "has been executed with all the usual formalities required by law, and duly enrolled, would in any case, like a feoffment in person, be only voidable and not void."), quoting *Evans v. Horan,* 52 Md. 602, 610–11 (1879) ("In England, ... it appears to be well settled, as it is in this country, where the common law has not been abrogated by statutory enactments, that the feoffment of a lunatic or idiot, in person, is only voidable and not void.").

[T]here can be no *bona fide* holder of title under a forged deed. A forged deed, unlike one procured by fraud, deceit or trickery is void from its inception. The distinction between a deed obtained by fraud and one that has been forged is readily apparent. In a fraudulent deed an innocent purchaser is protected because the fraud practiced upon the signatory to such a deed is brought into play, at least in part, by some act or omission on the part of the person whom the fraud is perpetrated. He has helped in some degree to set into motion the very fraud about which he later complains. A forged deed, on the other hand, does not necessarily involve any action on the part of the person against whom the forgery is committed. So that if a person has two deeds presented to him, and he thinks he is signing one but in actuality, because of fraud, deceit or trickery he signs the other, a *bona fide* purchaser, without notice is protected. On the other hand, if a person is presented with a deed, and he signs that deed but the deed is thereafter altered *e.g.* through a change in the description or affixing the signature page to another deed, that is forgery and a subsequent purchaser takes no title.

*Id.* at 215, 315 A.2d at 136.

With respect to alleged violations of statutes, we have recognized that not all contracts that transgress in that regard are necessarily void, but are dependent upon legislative intent. *See Beard v. American Agency Life Ins. Co.,* 314 Md. 235, 254–55, 550 A.2d 677, 686–87 (1988); *DeReggi Constr. Co. v. Mate,* 130 Md.App. 648, 663–65, 747 A.2d 743, 751–52 (2000) (holding that a violation of the Consumer Protection Act will not render a contract unenforceable without proof of injury or damage). As we recognized in *Lester v. Howard Bank,* 33 Md. 558, 564 (1871), we examine the statute as a whole:

"[B]efore the rule can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and a penalty only for doing a thing which it forbids, . . . the statute must be examined as a whole to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not so to be. In other

words, whatever may be the structure of the statute in respect to prohibition and penalty, or penalty alone, that is not to be taken as granted that the Legislature meant that contracts in contravention of it were to be void, in the sense that they were not to be enforced in a court of justice."

*Id.,* quoting *Harris v. Runnels,* 53 U.S. 79, 84, 12 How. 79, 13 L.Ed. 901, 903 (1851).

*Hudson v. Maryland State Housing Co.,* 207 Md. 320, 114 A.2d 421 (1955) and *Romm v. Flax,* 340 Md. 690, 668 A.2d 1 (1995) are particularly instructive in determining whether failure to comply with a statutory provision renders a deed voidable or void. In *Hudson,* Richard I. Hudson entered into two land installment contracts with a real estate corporation, Maryland State Housing Company, for the purchase and sale of property. The contracts were land installment contracts under the "Land Instalment Contract Law," [17] which was enacted by Chapter 596 of the Maryland Laws of 1951, codified at Sections 118 to 124 of Article 21, Maryland Code (1951), was "remedial in character" and enacted "to curb serious actual or potential evils." *Hudson,* 207 Md. at 331, 114 A.2d at 425; *Spruell v. Blythe,* 215 Md. 117, 122, 137 A.2d 183, 186 (1957).[18]

Hudson, who fell behind in his payments and faced foreclosure, demanded rescission of the contracts, claiming that the Housing Company did not furnish him with a signed copy of the first contract, in contravention of statutory requirements.

---

**17.** The statute uses the spelling "instalment" rather than "installment," and we adopt the statute's spelling when quoting it in this opinion.

**18.** Historically, land installment contracts were akin to leasing arrangements in which a "buyer" would make payments to a "vendor," but would face ejection and loss of equity should the buyer fail to fulfill the contract obligations. *See Long v. Burson,* 182 Md.App. 1, 17, 957 A.2d 173, 182–83 (2008). In an effort to remedy such harsh results, the General Assembly passed the Land Instalment Contract Act so that these contracts resembled traditional seller-financed transactions, thereby instilling the buyer with equitable ownership in the land and the process of foreclosure of the lien upon default rather than ejectment. *Id.* at 18–19, 957 A.2d at 183.

Section 119 of Article 21, Maryland Code (1951) requiring a signed copy of the installment contract provided:

(1) Every land instalment contract shall be evidenced by an instrument in writing signed by all of the parties thereto containing all of the terms to which they have agreed.

(2) At or before the time the vendee signs the instrument, the vendor shall deliver to him an exact copy of it and the vendee shall give the vendor a receipt showing that he has received the copy of the instrument. If such copy was not executed by the vendor, then unless the vendor within fifteen (15) days after notice that the vendee has signed, delivers to him a copy of the instrument signed by the vendor, the agreement and the instruments signed by the vendee shall be voidable at the option of the vendee and the vendor shall immediately upon demand refund to the vendee all payments and deposits theretofore made.

(3) Until the vendee signs a land instalment contract and receives a copy of it, signed by the vendor the vendee has an unconditional right to cancel the contract and to receive immediate refund of all payments and deposits made on account of or in contemplation of the contract. A request for such refund shall operate to cancel the contract; or

(4) When any such payment or deposit is accepted by the vendor from a vendee, the vendor shall immediately deliver to him a receipt therefor, which clearly states in 12–point type or larger, in typewriting or in legible handwriting his rights under paragraph (3) above.

In interpreting this language, we determined that an install-ment contract was voidable. In so doing, we contrasted the language of Section 119 with the "Retail Instalment Sales Act," then found at Sections 116 to 140 of Article 83, Maryland Code (1951), which, by its provisions, rendered contracts made in contravention of its provisions absolutely void:

Sec. 135 (Waivers by Buyer.) No act, agreement or state-ment of any buyer in any instalment agreement, shall constitute a valid waiver of any benefit or protection under the provisions of this sub-title.

We concluded that because the Land Instalment Contract Law included no comparable provision to the Retail Instalment Sales Act, noncompliance with the former rendered the deed voidable, rather than absolutely void.[19]

In *Romm*, in a suit for specific performance of a residential real estate contract, we were tasked with determining whether a seller's failure to provide a disclosure or disclaimer statement regarding rescission to the buyers of residential real estate, as required by Section 10–702 of the Real Property Article, Maryland Code (1974, 1988 Repl. Vol., 1994 Supp.), rendered the contract void. Section 10–702(g)(1) required the seller of residential real property to complete and deliver to the purchaser a disclosure or disclaimer statement on or before entering into a contract of sale and provided:

(g) *Effect of failure to deliver a statement.*—(1) If the disclosure statement is delivered later than 3 days after the vendor enters into a contract of sale with the purchaser, the contract is *void.*

(Emphasis added). In interpreting the meaning of the word "void," we declined to interpret it literally to mean "null and void." We stated that to do so, would have permitted the seller to get out of a disadvantageous deal, by choosing to withhold the required disclosure statement. We noted that to define "void" literally would be inconsistent with the legislative intent to grant rescission rights to purchasers rather than sellers. In holding that the term "void" meant "voidable at the option of the purchaser," we concluded that the failure of

---

**19.** In finding Hudson's contract voidable, we noted that he could and did waive whatever rights may have accrued to him by reason of the deficiencies of the contract, and that his willingness to receive a benefit while ignoring the contract's deficiencies was not without significance:

He received the benefit of the use and occupancy of the house for about a year and a half after the execution of [the first contract], and we think that he is now estopped to repudiate the contract and recover all of his payments and thus have the house rent-free for the period of his occupancy, whatever his rights might have been at any earlier stage.

*Hudson v. Maryland State Hous. Co.,* 207 Md. 320, 330, 114 A.2d 421, 425 (1955). The issue of waiver, in the present context, is not before us and we express no opinion regarding its efficacy.

the seller to deliver a disclosure or disclaimer statement as required by the statute did not render the entire residential real estate contract void. *Romm,* 340 Md. at 697–98, 668 A.2d at 4–5.

Turning to the present context, we note that PHIFA was enacted in 2005 as emergency legislation in order to protect financially distressed homeowners from con artists who would convince the owners to transfer title to their property to "investors" and enable the scammer to take the equity in the home or the value of the house less the money owed on it. Sections 7–301 to 7–321 of the Real Property Article originated as Senate Bill 761 and House Bill 1288, and the resulting enactment became effective on October 1 as Chapter 509 of the Maryland Laws of 2005.[20] The preamble to the statute [21] provides that the legislation was intended, in pertinent part,

---

**20.** PHIFA was modeled on a Minnesota statute regarding mortgage foreclosures, which passed in 2004, Minn.Stat. Ann. § 325N (West 2004).

**21.** The preamble to PHIFA provides:

FOR the purpose of specifying the form and contents of certain contracts and documents; providing that a homeowner has the right to rescind certain contracts and transactions within a certain time; providing for the manner of giving notice of rescission; requiring a homeowner who rescinds certain contracts or transactions to repay certain funds with interest within a certain time; prohibiting foreclosure consultants and foreclosure purchasers from engaging in certain practices; requiring a homeowner to be provided with copies of certain documents; providing that certain provisions in certain documents are void; prohibiting certain documents from being recorded within a certain period; establishing certain rebuttable presumptions; requiring a certain audit account to be restated under certain circumstances; providing for the enforcement of this Act; providing penalties for violations of this Act; requiring a written notice of a foreclosure sale to contain a certain statement; providing for the effect of a certain order for resale in a foreclosure proceeding; exempting certain persons from certain provisions of this Act; providing for the effect and construction of certain provisions of this Act; requiring a certain notice to be sent to certain record owners; requiring the Consumer Protection Division of the Office of the Attorney General to maintain a list of certain nonprofit organizations and to provide certain information to certain homeowners; defining certain terms; making this Act an emergency measure; and generally relating to foreclosure.

"FOR the purpose of ... prohibiting foreclosure consultants and foreclosure purchasers from engaging in certain practices; requiring a homeowner to be provided with copies of certain documents; providing that certain provisions in certain documents are void; prohibiting certain documents from being recorded within a certain period; . . . ."

Under PHIFA, a "foreclosure purchaser" [22] is obliged to provide the homeowner with a document entitled "Notice of Right to Cancel Transfer of Deed of Title," as well as furnish a copy to the homeowner immediately upon execution of any document that includes a foreclosure reconveyance:

(c) *Notice of right to cancel transfer.*—(1) If a foreclosure reconveyance is included in a foreclosure consulting contract or arranged after the execution of a foreclosure consulting contract, the foreclosure purchaser shall provide the homeowner with a document entitled "NOTICE OF RIGHT TO CANCEL TRANSFER OF DEED OR TITLE."

\* \* \*

(d) *Same—Copy to homeowner.*—The foreclosure purchaser shall provide the homeowner with a copy of the Notice of Right to Cancel Transfer of Deed or Title immediately on execution of any document that includes a foreclosure reconveyance.

Section 7–310. The language in the statute is absolutely devoid of references regarding whether the dearth of such notice renders the deed void or voidable.

PHIFA also provides homeowners with the right to rescind:

(a) *In general.*—In addition to any other right under law to cancel or rescind a contract, a homeowner has the right to:

(1) Rescind a foreclosure consulting contract at any time; and

(2) Rescind a foreclosure reconveyance at any time before midnight of the 3rd business day after any conveyance or

---

**22.** A "foreclosure purchaser" is "a person who acquires title or possession of a deed or other document to a residence in foreclosure as a result of a foreclosure reconveyance." Section 7–301(e).

transfer in any manner of legal or equitable title to a residence in foreclosure.

Section 7–305(a). The time period for rescission "does not begin to run until the foreclosure purchaser has complied with [Section 7–310]," which includes providing the homeowner with notice of her right to rescind. Section 7–310(e). In addition, PHIFA states that a deed or other document affecting title to the homeowner's residence may not be recorded during the 3–day rescission period. Section 7–310(k). Again, no language in the statute describes whether noncompliance with these requirements renders the deed void or voidable.

In enacting PHIFA, the Legislature did explicitly state that activities that were violative of certain provisions of the statute were void. The provisions expressly declared void by PHIFA are those that would waive a homeowners' rights; the provisions, rather than the entire deed, are subject to being declared void. *See* Sections 7–306(f), 7–310(f), 7–314(f), and 7–318(b).[23]

---

**23.** Section 7–306 ("Foreclosure consulting contract") provides in pertinent part:

(f) *Void provisions.*—Any provision in a foreclosure consulting contract that attempts or purports to waive any of the rights specified in this title, consent to jurisdiction for litigation or choice of law in a state other than Maryland, consent to venue in a county other than the county in which the property is located, or impose any costs or filing fees greater than the fees required to file an action in a circuit court, is void.

Section 7–310 ("Foreclosure reconveyance") provides in pertinent part:

(f) *Void provisions.*—Any provision in a foreclosure consulting contract or other agreement concerning a foreclosure reconveyance that attempts or purports to waive the homeowner's rights under this section, consent to jurisdiction for litigation or choice of law in a state other than Maryland, consent to venue in a county other than the county in which the property is located, or impose any costs or filing fees greater than the fees required to file an action in a circuit court, is void.

Section 7–314 ("Foreclosure surplus acquisition") provides in pertinent part:

(f) *Same—Void provisions.*—Any provision in a contract that attempts or purports to waive any of the rights specified in this title, consent to jurisdiction or choice of law in a state other than Maryland, consent to venue in a county other than the county in

Ms. Julian, however, contends that the Statute need not contain a "talismanic phrase specifying that any transaction in violation of the statute is void *ab initio,*" to render the deed of trust void, and relies on *Pagenhardt v. Walsh,* 250 Md. 333, 243 A.2d 494 (1968), *Dryfoos v. Hostetter,* 268 Md. 396, 302 A.2d 28 (1973), and *Ameriquest Mortgage Co. v. Paramount Mortgage Services, Inc.,* 184 Md.App. 120, 964 A.2d 279 (2009), for this proposition.

In *Pagenhardt,* we interpreted Section 30 of Article 21, Maryland Code (1957, 1966 Repl. Vol.), requiring affidavits of consideration to import validity to a mortgage or deed of trust, and provided that a mortgage or deed of trust is not valid except as between the parties thereto, unless there was an affidavit regarding consideration:

No mortgage or deed of trust shall be valid except as between the parties thereto, unless there be endorsed thereon an oath or affirmation of the mortgagee or the party secured by a deed of trust that the consideration recited in said mortgage or deed of trust is true and bona fide as therein set forth.

The affidavit of consideration in question was sufficient and otherwise correct, except the affiant's name was omitted. We interpreted the explicit statutory language that no deed of trust "shall be valid except as between the parties thereto, unless ..." as meaning that where the affidavit of consideration was deficient in form, as opposed to content, the mortgage was not valid, but was to be given effect as an equitable mortgage as between the parties and those having actual notice.

In *Dryfoos,* the question presented involved a deficient affidavit of disbursement, which completely voided the trans-

which the property is located, or impose any costs or filing fees greater than the fees required to file an action in a circuit court, is void.

Section 7–318 ("Waiver of rights") provides in pertinent part:

(b) *Void and unenforceable.*—Any waiver by a homeowner of the provisions of this subtitle is void and unenforceable as contrary to public policy.

action. Equity was not invoked because of statutory language that had been added by Chapter 718 of the Maryland Laws of 1968, to wit, that a deed of trust was not valid either as between the parties or as to any third parties, unless there was an affidavit regarding disbursement of funds:

(b) No purchase money deed of trust involving land any part of which is situated in Maryland, shall be valid either as between the parties or as to any third parties unless such deed of trust contains or has endorsed upon it at a time prior to recordation, the oath or affirmation of the party secured by such deed of trust stating that the amount of the loan which said deed of trust has been given to secure was paid over and disbursed by the party secured by the deed of trust to either the borrower or the person responsible for disbursement of funds in the closing transaction or their respective agent at a time no later than the final and complete execution of the deed of trust, provided, however, that this subsection shall not apply where a deed of trust is given to a seller in a transaction in order to secure payment to him of all or part of the purchase price of said property.

Section 30 of Article 21, Maryland Code (1957, 1966 Repl. Vol., 1971 Supp.).

In the present situation, the Legislature has spoken clearly when a provision was to be voided for violation of PHIFA. With respect to the notice of rescission language, the Legislature failed to include a reference to "void," as well as the word "valid," which was the term that precipitated the results in *Pagenhardt* and *Dryfoos*. In the absence of any language requiring the abrogation of a deed for violation of the notice requirement, we would be loathe to render such deeds void from their inception. *See Brown v. State*, 359 Md. 180, 216, 753 A.2d 84, 103 (2000) (Cathell, J., concurring) ("[T]he Legislature is presumed to be aware of the common law as it stands at the time of the enactment and that the law is not intended to change the common law absent an express, specific declaration to do so."). To declare a deed void because of lack of notice could and would radically alter the protection of all *bona fide* purchasers in a subsequent chain of title.

Our conclusion is consistent with the Courts of Special Appeals' holding that the avowed failure to give the requisite notice of rescission rights may render the deed in question only voidable, and not void. We, though, differ from our intermediate appellate court in our application and result. While the Court of Special Appeals explored the issues surrounding Wells Fargo and U.S. Bank's acquisition of the mortgage, our emphasis under PHIFA goes to whether U.S. Bank was on notice at the time of the foreclosure sale of a potential defect in the chain of title, as well as whether the rescission notice was sufficient under the statute and whether rescission actually occurred. Because the Circuit Court did not make any findings on these issues and instead focused on whether Wells Fargo had notice at the time it loaned money and whether U.S. Bank had notice at the time it took assignment, we must remand the case for further findings and a determination under PHIFA as to whether the instant deed is voidable.

In remanding this case for further proceedings consistent with this opinion, Ms. Julian will have the burden of production and persuasion regarding whether her Notice of Rescission was effective, as against U.S. Bank's interests, under PHIFA, *i.e.*, what the filing of her Notice of Rescission in the land records of Charles County put U.S. Bank on notice of, how that notice affected its status as a *bona fide* purchaser or *bona fide* lender, and whether the notice complied with the proper form as required by PHIFA. Should Ms. Julian make a prima facie showing on these matters, the burden of production and persuasion would shift to U.S. Bank to give it the opportunity to prove, unlike what it failed to show as regards the supersedeas bond question, that it nonetheless was a *bona fide* purchaser or *bona fide* lender for value. In this regard, U.S. Bank must adduce evidence supporting its apparent contentions that PHIFA does not apply to the transaction, that Ms. Julian was not entitled to file her Notice of Rescission under PHIFA, or that Ms. Julian's problems with the scam transaction should not be visited upon U.S. Bank as a *bona fide* purchaser or *bona fide* lender for value. Should

U.S. Bank meet its burden, the case ends, but if U.S. Bank does not carry its burden, the burden of production and persuasion would shift back to Ms. Julian to show that her rescission was valid as against U.S. Bank.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Dissenting Opinion by ADKINS, J., which MURPHY, J., joins.

ADKINS, J., dissenting.

I respectfully dissent from the majority opinion because I think it is based upon two propositions that cannot be reconciled. On the one hand it holds, like the Court of Special Appeals ("CSA"), that U.S. Bank is a bona fide lender for value, as a matter of law. The Majority points to the absence of any evidence that U.S. Bank knew that there was a foreclosure consulting contract in place, within the meaning of PHIFA, when it paid value and took title to the Julian note and deed of trust.[1] On the other hand, the Majority departs from the CSA in "application and result[,]" because it resolves the appeal by focusing not on U.S. Bank's notice at the time of assignment, but on its notice at the time of the foreclosure sale—of a potential defect in the chain of title created by Julian's rescission notice. Maj. op. at 677–78, 997 A.2d at 125-26. The Majority therefore vacates and remands because the Circuit Court "did not make any findings on these issues[.]" *Id.* at 678, 997 A.2d at 126. In short, the Majority's opinion

---

1. I use the terms "mortgage" and "deed of trust" interchangeably. See Alexander Gordon, *Gordon On Maryland Foreclosures* § 1.4 nn. 12–13 (4th ed. 2004).

means that (i) although at the time it was assigned the note and deed of trust, U.S. Bank was a bona fide lender for value without notice of a foreclosure consulting contract, (ii) it may lose this status when the loan goes into default because of a recently filed notice of rescission. I do not see how these two propositions can be harmonized.

A bona fide lender or a bona fide purchaser of real property takes free of defects or claims, and it does not lose this status once it is attained. Maintaining land records and adopting the notice system of priorities depends on this principle. Bona fide purchaser and bona fide lender status is defined by statute, Section 3–203 of the Real Property Article ("RP"), which provides:

§ 3–203 Subsequent deed; priority of deed first recorded

Every recorded deed or other instrument takes effect from its effective date as against the grantee of any deed executed and delivered subsequent to the effective date, unless the grantee of the subsequent deed has:

(1) Accepted delivery of the deed or other instrument:

(i) In good faith;

(ii) Without constructive notice under § 3–202; and

(iii) For a good and valuable consideration; and

(2) Recorded the deed first.

Maryland Code (1974, 2003 Repl. Vol., 2006 Suppl.), § 3–203 of the Real Property Article. A mortgage or deed of trust is considered a "deed" within the meaning of the statute.[2] The order of priority set forth in this statute means that, if U.S. Bank is a bona fide lender for value as the majority holds, the Notice of Rescission filed by Julian on August 23, 2007 will have no impact on U.S. Bank's right to hold the Deed of Trust

---

2. Section 1–101(c) of the Real Property Article "defines the term 'deed' as used in the Real Property Article to include, among other things, 'mortgage.' [Section 3–201] states that [e]very deed [or mortgage], when recorded, takes effect from its effective date as against the grantor, ... and every creditor of the grantor with or without notice.'" *Angelos v. Md. Cas. Co.*, 38 Md.App. 265, 268, 380 A.2d 646, 648 (1977) (quotation marks and emphasis deleted).

free and clear of Julian's claims.[3] This is why, unlike the majority, I believe U.S. Bank's knowledge at the time of the foreclosure sale of Julian's Notice of Rescission has no bearing on the resolution of this case.

Application of the priorities in RP Section 3–203 will determine the nature of the title that U.S. Bank is able to convey to any purchaser at a foreclosure sale. Thus, applying the Majority's holding that it was a bona fide lender as of the time it paid value for the Note and Deed of Trust, U.S. Bank would have the right to foreclose on default by the borrower and convey "all the title which the borrower had in the property at the time of the recording of the mortgage or deed of trust." RP § 7–105(a). Accordingly, the majority's holding about U.S. Bank's bona fide lender status collides with its mandate that the judgments of the CSA and the Circuit Court be vacated. It makes no difference whether the bank was on notice of a potential defect in the chain of title at the time of the foreclosure sale—its rights as a bona fide lender or assignee were determined at the time the mortgage was executed. *See Wash. Mut. Bank v. Homan,* 186 Md.App. 372, 397, 974 A.2d 376, 391 (2009) (holding that knowledge at time of taking mortgage is determinative). Thus, U.S. Bank or any third party purchaser acquires title free of any cloud from the Notice of Rescission filed by Julian after the Deed of Trust. *Cf. IA Constr. Corp. v. Carney,* 104 Md.App. 378, 387–89, 656 A.2d 369, 374–75 (1995) (holding that a mechanic's lien does not take priority over rights acquired by bona fide mortgage lender for value when mortgage recorded before petition for mechanic's lien).

I would vacate the judgment of the CSA, with direction to vacate that of the Circuit Court, but for different reasons. I do not agree that U.S. Bank necessarily acquired bona fide lender status, as a matter of law, based on what we have in

---

**3.** I assume that the assignment for value to U.S. Bank took place before Julian filed the Notice of Rescission. As the Substitute Trustees initiated the foreclosure proceedings before Julian filed her Notice of Rescission, the Deed of Trust must have been assigned to them before the Notice of Rescission was placed in the land records.

this record. Hence, I advocate for a remand, but with different instructions to the Circuit Court as to what facts need be determined. My departure from the Majority is based on PHIFA.

Julian contends that PHIFA significantly restricts when and how a lender may claim bona fide status because the well-publicized statute broadcasted the basic elements of a foreclosure rescue scam and specifies that a lender or its assignee is bona fide only if it takes without knowledge, not of actual fraud in the transaction, but that "a foreclosure consulting contract is in effect...." RP § 7–311(e). Section 7–311(e) provides:

> A bona fide purchaser for value or bona fide lender for value who enters into a transaction with a homeowner or a foreclosure purchaser when a foreclosure consulting contract is in effect or during the period when a foreclosure reconveyance may be rescinded, without notice of these facts, receives good title to the property, free and clear of the right of the parties to the foreclosure consulting contract or the right of the homeowner to rescind the foreclosure reconveyance.

This language in PHIFA means that if a bona fide lender for value has notice that a foreclosure consulting contract is in effect or that the reconveyance rescission period is in effect, the lender is subject to defenses against the note and mortgage based on PHIFA.[4] In my view, PHIFA elevates the

---

**4.** As the majority noted, RP Sections 7–301 to 7–321 (PHIFA) were repealed in 2008, reenacted by Chapters 5 and 6 of the Maryland Laws of 2008, and recodified in RP Sections 7–301 to 7–325. Maj. op. at 648 n. 3, 997 A.2d at 108 n. 3. Before its rescission in 2008, PHIFA contained an express provision protecting bona fide purchasers for value and bona fide lenders for value from any cloud on the title resulting from a foreclosure rescue scam. RP Section 7–311(e) provided:

> A bona fide purchaser for value or bona fide lender for value who enters into a transaction with a homeowner or a foreclosure purchaser when a foreclosure consulting contract is in effect or during the period when a foreclosure reconveyance may be rescinded, without notice of those facts, receives good title to the property, free and clear

level of inquiry that a mortgage lender should undertake when it makes a loan, or takes assignment of a note.

Here, we have a bank, Wells Fargo, which made a loan to Wilson in order to finance purchase of a property which had, less than four months earlier, been the subject of a foreclosure proceeding initiated by another bank, Ameriquest, against the then-property owner, Julian. The record reveals that Ameriquest's foreclosure proceeding was not completed, nor dismissed, at the time of Wells Fargo's loan and Julian's conveyance to Wilson. These facts are discernible from the county land records. There is no evidence in this case that Wells Fargo, when it made the mortgage loan, took any steps to verify that Wilson had any income to pay the loan. Indeed, the affidavit of indebtedness filed by the Trustees suggests that Wilson made, at most, one payment on the loan. The record does not reveal the date when U.S. Bank took assignment of the loan, or how much it paid for the loan. There is no evidence as to whether this loan was individually purchased, or assigned to U.S. Bank as part of a bulk transfer of mortgage loans.

In my view, given these facts, both Wells Fargo and U.S. Bank had the obligation, at the least, to make some limited inquiry about whether a loan foreclosure contract was in effect at the time of the Wells Fargo mortgage loan to Wilson. This inquiry might have been satisfied by an affidavit by a closing attorney, or even the new borrower that no foreclosure consultant was involved. Even verification that the new purchaser was living in the home, as the deed of trust required, and could afford the monthly loan payments may have been sufficient.[5] Wells Fargo and U.S. Bank may have taken these

---

of the right of the parties to the foreclosure consulting contract or the right of the homeowner to rescind the foreclosure reconveyance. Maryland Code (1974, 2003 Repl. Vol., 2006 Cum. Supp.). For whatever reason, the General Assembly did not include this provision, or any language similar to it, in the recodified PHIFA. *See* RP Sections 7–301 to 7–325 (1974, 2003 Repl. Vol., 2008 Cum. Supp.).

**5.** The record suggests that it was Julian, not Wilson, who was living in the home, although the Deed of Trust required that the borrower live in

steps, but the record does not produce any evidence of that. We do know that the loan went into default almost immediately. The affidavit of indebtedness filed by the substitute trustees in this foreclosure showed that interest was owing from March 1, 2007, 60 days after the date for which interest was pre-paid at settlement. We also know that Wilson reported a fraud to Wells Fargo in March 2007, indicating that the bank had told her that her mortgage loan payment was late, when in fact she had no mortgage.

To prioritize the competing claims of the lenders and Julian, we should start with review of RP Section 7–311(e), and its use of the familiar terms, "bona fide purchaser" and "bona fide lender." The elements required to prove this status are: "(a) That he [or she] must have given value for the property; (b) that he [or she] must have dealt in good faith with respect to the purchase; and (c) without notice or knowledge of any infirmity in the title of his [or her] vendor." *People's Banking Co. v. Fid. & Deposit Co.*, 165 Md. 657, 664, 170 A. 544, 547 (1934); *see also Homan*, 186 Md.App. at 396, 974 A.2d at 390 ("Maryland cases have treated lenders who secure their interests with a mortgage or deed of trust as entitled to the protections available to bona fide purchasers for value, where such lenders were without notice of the mortgagor's fraudulent conduct.").

A party claiming the status of a bona fide purchaser or bona fide lender bears the burden of proving that she acted without notice and in good faith. *See Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 615 (2d Cir.1998); *First Nat'l Bank of Cicero v. Lewco Sec. Corp.*, 860 F.2d 1407, 1411–12 (7th Cir.1988); *Gutekunst v. Cont'l Ins. Co.*, 486 F.2d 194, 195 (2d Cir.1973); *Ins. Co. of N. America v. United States*, 561 F.Supp. 106 (E.D.Pa.1983); *Otten v. Marasco*, 235 F.Supp. 794, 797 (S.D.N.Y.1964), *aff'd*, 353 F.2d 563 (2d Cir.1965); *Strand v. Prince–Covey and Co.*, 534 P.2d 892, 894 (Utah

---

the home. A verification of who was residing at the home would have led the bank right to Julian.

1975). *But see Fid. & Cas. Co. of N.Y. v. Key Biscayne Bank,* 501 F.2d 1322, 1325 & n. 3 (5th Cir.1974).

Although sometimes it is said that the party alleging fraud bears the burden to prove it against a bona fide purchaser, this will depend on the circumstances.[6] More importantly, under PHIFA, one need not prove fraud to invoke the protections of the statute—merely having notice of the mortgage consulting contract will suffice. This Court has not decided the question of who shall bear the burden to show that a lender is a bona fide lender for value within the meaning of PHIFA. I would decide that issue by allocating that burden to the lender because the lender "has readier access to knowledge about the fact in question." *See* Fleming James Jr., *Burdens of Proof,* 47 Va. L.Rev. 51, 58–61 (1961). Surely U.S. Bank has readier access to how it acquired the Note and Deed of Trust, and what it knew about Wilson's transaction with Wells Fargo, than Julian does. Therefore, I conclude, U.S. Bank has the burden to show that it meets the standard for a bona fide lender for value.

In my view, nothing in the record shows that Wells Fargo made the loan or U.S. Bank took assignment of the deed of trust having made any inquiry, no matter how limited, into any of the following questions: who arranged for the loan, what was the income of the borrower (Ms. Wilson), could the borrower afford the loan payments, was Ms. Wilson living in the house (which the deed of trust requires her to do), why was she purchasing the house, why had the foreclosure action

---

**6.** *See Berger v. Hi–Gear Tire & Auto Supply, Inc.,* 257 Md. 470, 475, 263 A.2d 507, 509–10 (1970) ("[T]he burden of proof is on the party assailing the transaction ... It is well established in this State that facts and circumstances may be such as to shift the burden to the grantee to establish the bona fides of the transaction."); *Long v. Dixon,* 201 Md. 321, 324, 93 A.2d 758, 759 (1953) ("[A]lthough he who alleges fraud generally must prove it, facts and circumstances of a conveyance, especially one between near relatives, may be such as to shift to one who claims to be a *bona fide* purchaser for value the burden of proving that he is.") (quotation marks omitted); *Kline v. Inland Rubber Corp.,* 194 Md. 122, 137–38, 69 A.2d 774, 780 (1949) (holding burden to prove fraud shifted to family members to prove themselves bona fide mortgagees for value as against judgment creditor).

against Julian remained open? Without answers to any of these questions, I think we must assume that both Wells Fargo and U.S. Bank placed blinders on, the former in making the loan, and the latter in purchasing it. With the proliferation of mortgage lending scandals and the enactment of PHIFA, this intentional blindness simply is no longer enough, if it ever was, to meet the good faith element of establishing bona fide lender status. We must bear in mind that foreclosure proceedings are equitable proceedings in nature.

In conclusion, I would vacate the judgement of the CSA, and remand to it, with directions to remand to the Circuit Court for an evidentiary hearing, at which U.S. Bank must establish that it stands as a bona fide lender for value, without knowledge of the mortgage consulting contract, any other violation of PHIFA, or any other fraud or irregularity. Either U.S. Bank, or Wells Fargo, who originated the loan, and now services it for U.S. Bank, will possess the best information about the questions that are unanswered on this record. The fact that Wells Fargo, who originated the loan, also now services the loan for U.S. Bank may be of significance in making the determinations on remand.

Judge MURPHY authorizes me to state that he joins in the views expressed in this opinion.